# Briarfield Iron Works Co. *v.* Foster.

*Appeal from Order appointing Receiver.*

1. · *Special administrator; what bill may maintain.*—A special administrator, appointed under the provisions of sections 1994 and 1995 of the Revised Code, may file a bill to have a receiver appointed over property, in which his intestate was interested, when necessary to preserve the property, or to prevent its removal beyond his reach.

2. *Receiver; appeal from order appointing; what will not be considered on.*— On appeal from an order appointing a receiver, the appellate court will not inquire whether it appears from the bill that no material defendant resides in the district where it was filed; the defendants not having answered, and the bill being amendable in these particulars.

3. *Special administrator; what terminates authority of.*—The regular appointment of an administrator in chief terminates the authority of special administrator, unless the latter contests it, and perfects and obtains an appeal under section 2015 of the Revised Code, when the grant of letters is stayed until the appeal is disposed of.

4. *Appeal from order appointing administrator in chief; bond required.*—The statute not prescribing the amount of bond to be given where an appeal is taken from an order appointing an administrator in chief, it is the duty of the judge of probate to exact ample bond on behalf of the party appealing, to indemnify those interested in the estate against loss, which may be sustained by continuing the special administrator in office.

5. *Receiver, rule as to appointment of.*—No unbending rule can be declared applicable to every case in which the appointment of a receiver is sought, but the court lays down certain well established principles, which should govern in the exercise of the power.

6. *Same.*—A receiver should not be appointed in the first instance, in assertion of a disputed right, and the defendant displaced from possession of property, when needed protection can be given by writ of injunction, or equitable attachment; these latter writs can issue only after bond given to indemnify the adverse party against injury from wrongful resort to the process, whereas no such security for the defendant's protection is required from those procuring the appointment of a receiver, the bond exacted being only for the faithful performance of his duty.

7. *Same.*—In this case, a special administrator, appointed here, at the instance of one claiming to be principal legatee under a will which he was seeking to have probated, instead of another will, making a different disposition, theretofore admitted to probate by the court of the State where testator resided, sought the appointment of a receiver over the property of a corporation, in which the decedent was a stockholder, and of which he was a creditor, on

[Briarfield Iron Works Co. v. Foster.]

vague, uncertain, and, in some respects, inconsistent allegations, based merely on "information and belief" of danger to the interests of the decedent.  The only direct charge of danger—the, removal of property, and its danger of deterioration from want of proper care—was denied by affidavits.  *Held*, a court of equity ought not, in such a case, to appoint a receiver ; and it should not interfere at all, by the exercise of any of its extraordinary powers, without requiring ample security from complainant against any unjust loss which might thereby be inflicted on the adverse parties.

APPEAL from Chancery Court of Marengo.
Heard before Hon. A. W. DILLARD.

The appellee, Thomas J. Foster, as a special administrator of the estate of Edwin A. Glover, deceased, filed this bill on the 26th day of October, 1875, against the "Briarfield Iron Works Company," a domestic corporation, John F. Walton, F. S. Lyon, B. W. Whitfield, D. F. Prout, J. F. Griffin, and P. J. Glover, of Marengo county; William White, William B. and Richard Inge, as executors of John Collins, deceased, W. H. Ross, all residents of Alabama; and Mrs. Amanda Sterling, of Texas, praying the appointment of ,a receiver over the property of the Briarfield Iron Works, and for other relief hereinafter stated.

It appears from the bill that Edwin A. Glover died a resident of Texas, on the 20th of February, 1874, leaving a considerable personal estate here, and large estates, real and personal, in Texas and Mississippi.  It also stated that "Mrs. Amanda Sterling, of Waller couty, Texas, asserts that said Edwin A. Glover left an instrument i writing, dated February 24th, 1870, which is the last will and testament of said deceased, in which she is nominated sole executrix, and under which she is the principal legatee, either directly or in trust of the entire estate;" that she is "now endeavoring to have said instrument properly probated as the last will and testament of said deceased," in the proper court in Texas; "that Pearson J. Glover asserts that said Edwin A. Glover executed another instrument in writing, dated the 26th day of November, 1873, which is the true and genuine last will and testament of said decedent, or a codicil thereto, in which he, said Pearson J. Glover, is the only person named as legatee, and that all the interest of said E. A. Glover, deceased, in and to the Briarfield Iron Works Company, and a mortgage on said company's property to secure a debt of about $18,000, is devised and bequeathed to him by said instrument; that a suit is now pending between said Pearson J. Glover and said Amanda Sterling, in the district court of Waller county, Texas, to establish and probate the instrument of November 26th, 1873, as the last will and testament of E. A. Glover, deceased, or as a codicil thereto, and he is contesting the validity of the instrument dated 24th February,

187', and is objecting to the probate of the same as the last will and testament of the deceased, unless the instrument he hold is admitted as a codicil thereto, or a part thereof."

It is further stated that by reason of said contest, no letters testamentary could issue here until the decision of the case pending in Texas, and that the probate court of Marengo, on the 19th day of October, 1875, appointed complainant special administrator to collect, secure, and preserve such goods and chattels of the estate as are in the State of Alabama, and that, upon advice of counsel, he deems it his duty to file the present bill, to prevent sacrifice and loss to the estate, which is imminent and threatened by certain parties, who claim an interest adverse to Mrs. Amanda Sterling, Pearson J. Glover, and such other heirs and legatees as may be entitled to distribution of his estate.

It is alleged that "by virtue of an act of the general assembly of Alabama, approved January 28th, 1867, F. S. Lyon, J. Gorgas, James Crawford, John Collins, James D. Browder, W. H. Ross & J. F. Griffin, B. W. Whitfield, D. F. Prout, and Edwin A. Glover, together with such other persons as they may see fit to associate with them, and their successors, were constituted a body corporate, under the name and style of the 'Briarfield Iron Works Company,' with power to hold property of any description, and to any amount, &c.; that the purpose of the corporation was to manufacture iron and steel castings, and the corporation had power to prescribe the number of shares, into which its stock should be divided, to provide for the election of officers of the corporation, and to ordain, establish, and put in execution such by-laws, ordinances, and resolutions as are not inconsistent with the laws of the State of Alabama, and of the United States," as may be necessary, &c.

On March 1st, 1867, the corporators and a number of others, having subscribed about $120,000 to the capital stock of the company, assembled at Briarfield, in Bibb county, Alabama, and organized the Briarfield Company, in accordance with the act of the general assembly, and elected a president and directors, nearly all of whom were the original incorporators. Among the directors elected, was Edwin A. Glover, who paid up the amount of stock subscribed by him, and received shares to the amount of $17,200, which, complainant is informed, he held and owned at the time of his death.

Edward A. Glover removed to Texas shortly after his election as director, and it is alleged, never participated in the management of the affairs of the company. It is alleged, that the company "acquired by purchase, a large tract of

mineral lands in Bibb county, Alabama, of the value of $75,000, containing about 10,000 acres and erected furnaces and machinery to the value of $75,000 ; that there was not, after the organization up to the time of Glover's death, any by-laws, ordinances and resolutions enacted for the government of said corporation as required by its charter, and no reports made of its affairs, or any officers re-elected, so far as complainant is informed," and " he charges, that although large amounts have been realized from rents of said property, and from the manufacture of iron, to-wit, not less than $10,000 per annum, said Glover received no dividend on his stock, and no account of the expenditure of these large sums of money."

The bill further charges, that " the affairs of the company have been so managed as to render the stock owned by Glover, of no market value, and to make his estate liable for the debts of the corporation to the extent of his stock, and further to cause the estate to lose a large amount of money lent by Glover, as well as become bound for large amounts which the holders of the notes and said corporation contend that Glover was surety, as hereinafter explained." It is also averred, that under the 5th section of the act of incorporation, after the election of officers, the company began to borrow large sums of money, on mortgages of its property, and that the mortgages, with interest due thereon, now outstanding, amount to between eighty and ninety thousand dollars, and your orator shows that he does not know how this large sum of money has been expended, and therefore says the interest and rights of the estate of said Edward A. Glover, deceased, are in jeopardy," &c.

The bill further alleges, that " in addition to the mortgages above referred to, that on or about the 1st day of January, 1867, F. S. Lyon, James D. Browder, John Collins, D. S. Prout, B. F. Whitfield and Edward A. Glover, gave to John T. Walton their promissory note for $22,400, payable January 1st, 1868, for money alleged to have been borrowed for the use of the Briarfield Iron Works Company, and your orator shows that at the time of the borrowing of this money, the act of the general assembly to incorporate the Briarfield Iron Works Company had not been passed, and at the time of the making of such note there was no such corporation, and the debt due said John T. Walton is the individual debt of the parties who signed the note, and not the indebtedness of the incorporation ; that on the 19th day of March, 1867, said corporation executed a mortgage to said Walton to secure said note, with the condition that if it was not punctually paid at maturity, said Walton should take posses-

sion of the property conveyed by the mortgage, and sell the same, or so much of it as might be necessary to pay the mortgage debt; that on the 25th of February, 1870, Walton, in consideration of twenty-nine thousand eight hundred and thirty-eight dollars, transferred, sold, and conveyed to James Crawford, the said note and mortgage; that only twenty-five thousand dollars was in fact paid by said Crawford, and that this amount was made up by contribution from Crawford, Lyon, Ross, Browder, Griffin, and Whitfield, as shown by a written agreement with said Crawford, by which he agreed to hold the debt and mortgage for the protection of said contributors.

It is also alleged, that Crawford is a bankrupt, and "further, that if the mortgage given by the corporation is not void, and the note secured thereby a valid claim, your orator shows that said note was given on their own responsibility by parties who became officers and stockholders in the Briarfield Iron Works Company, and when the same was purchased from John T. Walton, by said Crawford, Lyon, Browder, and Whitfield, (four) three of the original makers of the note to Walton, contributed the sum of twelve thousand five hundred dollars to make the payment, and that they thereby became purchasers of their own indebtedness, and that Ross, Crawford and Griffin, who contributed the other twelve thousand five hundred dollars necessary to complete the payment and effect the transaction with Walton, became the owners of the note to the amount so paid by them, and are entitled in equity to the benefit of the mortgage transferred to Crawford.   Your orator further shows, that all of the above named parties are now, and always have been, officers or large stockholders in the corporation, and if the debt was not extinguished by the transaction, as orator avers it was, the parties who were the beneficial assignees of the mortgage, or some of them, have received large sums of money on account of the corporation, and yet failed to pay anything on said mortgage, or to keep down interest thereon; that if said note for twenty-two thousand four hundred dollars, given to Walton, was in fact given for money borrowed, for the use of said corporation, as is set forth in the mortgage given to secure the payment of said notes, then the makers of the note, including said Edward A. Glover, deceased, are not the principal debtors, but are sureties of the corporation, and that when Crawford paid Walton and took a transfer of the note and mortgage, he received the security for the benefit of all who were sureties on said note."

It is further averred in the bill, "that subsequently the corporation, on the 19th March, 1867, borrowed a large sum

of money from E. A. Glover, deceased, which now amounts
to about eighteen thousand dollars, and executed to him a
note secured by a mortgage of their property; that this note
and mortgage are in the possession of some of the defendants
to this bill, but that orator is unable to state its date, or
when it fell due; but avers that the debt evidenced by it and
the mortgage, is now due and unpaid, and if the mortgage to
Walton is void, then said mortgage to Glover is a first lien
on the property of the corporation, and entitled to priority of
payment."

The bill also alleges, that the corporation borrowed
money from John Kohn and William Inge, and gave note,
and executed mortgages on the property of the company to
secure the same; but that complainant is unable to state the
date and priorities of said mortgages, and "only shows on
information that they are now due and are subsequent to the
mortgage of Glover."

The bill further states, that "your orator shows from in-
formation and belief, that other mortgages, deeds of trust or
assignments, were made by the Briarfield Iron Works Com-
pany, or by some one claiming to act as an officer or agent
of said company; at different times and subsequent to the
mortgages to Collins and Inge; that your "orator has no
means of knowing when, or to whom, these conveyances were
made, or whether the liens created thereby had been extin-
guished or are still outstanding; and your orator states on
information and belief only, that a deed of trust was made to
one William White, prior to the close of the year 1873, and
that said William White received as commissions for his ser-
vices the sum of $2,000, and had under his control assets to
a large amount belonging to the Briarfield Iron Works Com-
pany, but your orator has no information of what these as-
sets consisted, or for whose benefit the trust was created,
and he is advised that it is his duty as special administrator
to seek a discovery."

It is further alleged, that Crawford, until the last few
months, has made no attempt to sell the property included
in the mortgage assigned to him by Walton; and now, "when
it is a well known fact that said Crawford is bankrupt—when
the pressure in financial matters has affected the value of all
classes of property, especially of that kind, the value of which
consists in the profits to be derived from the mining and
manufacturing of iron ores, and when, owing to the contest
going on in regard to the validity of the wills of the deceased,
there is no executor or executrix who can protect the interest
of Glover's estate—the said Crawford has advertised the said
Briarfield Iron Works, with all its valuable fixtures and ma-

chinery, for sale under said mortgage, on the 25th day of November, 1875, for cash."

Complainant states that "he has been informed, and therefore charges, that the beneficiaries in said mortgage intend to purchase at said sale, and pull down the fixtures and machinery, which have been put upon it at a cost of about $100,000, which will greatly reduce the value of the equity of redemption." The bill further states that the Briarfield Iron Works Company is insolvent, its president has left the State several years ago, and said company has ceased manufacturing iron, steel and castings; that it has no office or known place of business, and its valuable property at Briarfield is not used in any way, and its costly machinery liable to sustain injury and damage;" that Crawford has never taken possession, and is himself absent from the State.

The bill prays, among other things, that the Walton mortgage be declared void and annulled; that the defendants be required to discover whether either of them have any notes or other property belonging to the estate of Glover, deceased, especially the note and mortgage made by the company to him; that said mortgage be declared a first lien upon the property; that an account be taken of what is due thereon, and the other mortgages, and the said mortgages be foreclosed, the property sold, and the proceeds be applied to the satisfaction of the mortgages and all other liens, according to their respective priorities. It also prays, that a receiver be appointed, "with full and complete authority to demand and receive from said James Crawford the note and mortgage which he claims is a valid lien on said Briarfield Iron Works property, and to bring the same into court, and to demand and to receive from the other defendants such notes and mortgages as they or any of them may hold upon said property, and to bring the same into court that their validity and respective priorities may be determined; and to take possession of all the books and papers belonging to said company, real estate and other property, and to hold the same subject to the further order of the court," &c.

The affidavits of Lyon, Browder and Griffin were offered in opposition to the appointment of a receiver. The affidavits of Browder and Griffin state that the note and mortgage transferred to Crawford are the property of the affiants, and F. S. Lyon, W. H. Ross and the assignee of said Crawford; that said Glover never in his life time acquired, or pretended to have, any claim or interest whatever to the said note; that Crawford is trustee for the parties owning the note, and although he has been declared a bankrupt, is an honest man, and all the parties owning the note are willing to confide in

him as trustee; that long before the filing of the bill, Gen. J. Gorgas, who was still president of the company, employed one Alvis, who was a practical and experienced manager of such property, and in every way fitted to watch over and preserve it, to take charge of the Briarfield Iron Works property; and that he has been so engaged for more than a year past. Lyon, in his affidavit, denied the right of Foster to prosecute this suit, or to ask a receiver, upon the following grounds: Glover died a resident of Texas, in the year 1874, leaving a last will and testament, which was duly admitted to probate in the district court of Waller county, Texas, which granted letters testamentary to Amanda Sterling, who has duly qualified as executrix of the will. Glover left no property or effects in Marengo county, except certain debts due him, amounting to less than five thousand dollars, and held a mortgage on the Briarfield Iron Works property, duly recorded in Bibb county, to secure a debt of ten thousand six hundred and sixty-six dollars. The note given to Walton was for borrowed money used in improving the property and buying machinery, before the property was conveyed to the corporation, afterwards formed by act of the legislature, and afterwards the corporation assumed it, as it had received the consideration. None of the debt having been paid, Lyon, Browder, Griffin, Whitfield and Crawford furnished money out of their individual funds to purchase it and the mortgage securing it from Walton, to prevent a sale of the property by him. Lyon denied any intention to defeat, hinder, or delay the creditors of the corporation by means of the sale, which Crawford had advertised, and expressed a willingness to surrender the property, to be purchased at the sale, to any subsequent creditor who might reimburse them. He denied any intention on his part, or on the part of any of the purchasers of the Walton mortgage, to remove any part of the machinery connected with the property, and denied that Glover's estate had any interest whatever in said mortgage. He denied any misapplication of the funds of the corporation, and averred that if complainant had taken the trouble to make proper inquiry, he would have found that all its funds had been faithfully applied. He further showed by duly certified copies of the proceeding in the court of Waller county, Texas, that Edwin A. Glover's will had been duly admitted to probate, and that letters testamentary had been granted to Mrs. Amanda Sterling, who had qualified as executrix of the will. He also showed by certified copies of the record of the proper court, that since Foster was appointed special administrator, upon Pearson J. Glover's application, he (said Lyon) had been appointed and qualified as adminis-

(40)

trator, with the will annexed, of the estate of Glover in Alabama.

The record, submitted along with the affidavits, shows that Foster was appointed special administrator of Glover's estate by the probate court of Marengo, on the 19th day of October, 1875. Afterwards, on the 17th day of November, 1875, Lyon appeared in the same court, filed a petition in writing under oath, together with a duly certified copy of Glover's will, which had been admitted to probate in Texas, and prayed that letters of administration, with the will annexed, be granted to him, on the ground that he was a creditor of said estate. P. J. Glover appeared and contested the application, but his objections were overruled and letters issued to Lyon, who thereupon duly qualified. Glover prayed an appeal therefrom, "and for this purpose tenders to the court a good and sufficient bond for the costs of such appeal." The bond tendered by him, and which was approved by the probate judge on the 9th day of November, 1875, was in the penalty of thirty dollars, and recites that Glover had applied for and obtained an appeal to supercede and reverse the judgment granting letters with the will annexed to Lyon.

It is recited in Glover's application for appeal, that on the contest of the grant of letters to Lyon, petitioner was made a party to the proceedings and objected to the grant of letters for matter appearing on the face of the record.

The foregoing is a full synopsis of the case made by the bill and affidavits. The bill is quite lengthy, containing thirty paragraphs, and it is impossible to set out in detail the matters to which it refers, without greatly and unduly lengthening the report of the case.

The bill was sworn to by Foster, who made affidavit that "the statements in the foregoing bill of complaint are made by him on information, and to the best of his knowledge and belief they are true."

On the 15th day of November, 1875, before any of the defendants had answered or were in default, the cause came before the chancellor on the application for a receiver.

He overruled the objection as to Foster's right to maintain the suit and to apply for a receiver, and made an order appointing a receiver, and directed Crawford to turn over the property of the Briarfield Iron Works to him.

From the decree the present appeal is taken, and it is now assigned as error.

WATTS & SONS, for appellant.

EUGENE McCAA, contra.

MANNING, J.—According to the Revised Code (§§ 1994, 1995,) the office of a special administrator is to collect and preserve the goods and chattels of the deceased "until letters testamentary or of administration have duly issued." And he "has authority to collect . . . the debts of the deceased, and to secure and preserve such goods and chattels, at such expense as may be deemed reasonable by the probate court, and for such purposes may maintain suits as administrator." These provisions are ample to authorize him to institute a suit in chancery, like the present, if the facts justify it, in order to protect property from destruction, or removal beyond reach, when the estate of which he is administrator is directly and largely interested therein.

2. On the application now before us, we will not inquire whether or not it affirmatively appears, that no material defendant resides in the county in the chancery court of which the bill was filed. The bill would be amendable in that particular; no answer, plea or demurrer to it was yet filed. There was no default, however, on the part of any defendant. The time to file either had not elapsed; indeed, the defendants had not been brought into court when this appeal was taken from the action of the chancellor in appointing a receiver.

3. The regular appointment, if uncontested, of an administrator in chief, would terminate the authority of the special administrator. But there was an appeal taken and allowed from the action of the probate court appointing Mr. Lyon administrator; and this has the effect, under section 2015 of the Revised Code, of staying the grant of letters to him until the appeal is disposed of finally. The statutes do not prescribe the amount for which an appeal bond shall be required, but leave it to the judge of probate to be determined by him. He is expected to see to it—if the proposed administrator is fit and competent, and can give ample security for a faithful administration—that the persons interested in the estate shall be indemnified by an adequate bond on behalf of the person taking the appeal, against the loss that may be sustained by continuing in office a special administrator whose authority may be inadequate to a proper administration.

4. The greater part of the complainant's supposed equity arises out of an assumption, about which other parts of the bill show he has doubts—that the first mortgage made by the Briarfield Iron Works Company, March 19, 1867, is not valid, and that the debt it provides for is not the debt of the company; because, as appears by the mortgage, the debt was contracted the first of January, 1867, while the charter to the company was not granted until the 28th of that month,

[*Briarfield Iron Works Co. v. Foster.*]

and the company was not organized until March 1st of that year. The mortgage describes the very valuable property of the company as that which had been bought by Francis S. Lyon, for himself and others, from the United States, and conveyed by him to the company; and the debt to John T. Walton, to secure which the mortgage was made, is set forth as a debt for which Walton had the note of said Lyon and John Collins, James D. Browder, Edwin A. Glover, (of whose estate complainant is special administrator,) D. F. Prout and Bryan W. Whitfield; who are the same persons that, with two or three others, are described in the charter as the corporators of the company. And the mortgage further declares that the note was given for "money borrowed for the Briarfield Iron Works Company." Now, since complainant does not profess to know, or have any reliable information to the contrary, and since Mr. Glover, for the benefit of whose estate he is represented as filing this bill, is a signer of the note and was a director of the company when the mortgage was made—it does not seem very difficult to believe it true, that the money was borrowed for the benefit of that company a few weeks before the persons composing it succeeded in procuring the passage through the general assembly of the charter which constituted them a corporation, and had been used in paying for or improving the very property to own and operate which the corporation had been created, and which, immediately after it was constituted, Mr. Lyon had conveyed to it. It could as well, in consideration of the transfer of this property to it, agree to pay the note given by the vendors to Walton, and make a mortgage to secure the payment of it, as execute a promissory note and mortgage for the price to the vendors themselves. By the former transaction, the corporation would then, in effect, become the principal debtor to Walton, and the original makers of the note become sureties for it and co-sureties with each other. And if after this, some of them and other persons, as appears from other parts of the bill and exhibits, contributed their money to purchase a transfer of the note and mortgage from Walton, without recourse against him, to James Crawford, so as to preserve the liability of the company and its oldest mortgage, to secure reimbursement of the money so advanced for it, we are not acquainted with any rule or principle of equity which requires a court of chancery to interfere and defeat so proper an arrangement.

As assignee of the mortgage for the benefit of himself and others, Mr. Crawford would seem from the bill itself and the exhibits, to have the best and oldest deed of the property, and the legal title, with the right as mortgagee, to the pos-

session. Whether as such he is trustee for those only who joined him in advancing and paying the amount of the note, and in procuring a transfer of it to him, or in some aspects for them and complainant as administrator also, we need not stop to inquire. For if the latter, complainant would not be entitled, in opposition to all others equally interested, to have Crawford removed from his trusteeship upon the allegations against him in this bill. Much less can complainant be allowed, according to one of the prayers in his bill, to have the note and mortgage, which do not, at all, belong to him, taken away from Crawford, who holds them for, and by the wishes of, their owners, as evidence of their rights against the company, and put into the hands of a receiver. Indeed, we do not understand upon what principle the prayers in the bill are founded, which seek to have the notes and mortgages which belong to these and other creditors mentioned in the bill, taken from the owners of them and delivered to a receiver of the debtor's property.

"The court," (says Mr. Kerr in his work on Receivers,) "by taking possession at the instance of the plaintiff, may be doing a wrong to the defendant; in some cases an irreparable wrong. If the plaintiff should eventually fail in establishing his right against the defendant, the court may, by its *interim* interference, have caused mischief to the defendant, for which the subsequent restoration of the property may afford no adequate compensation."—(p. 5).

The authority, therefore, to appoint receivers, should be used by a chancellor with great circumspection. Property is not taken from a party in possession, claiming in good faith the right to it, before judgment in actions at law, without first exacting from him at whose suit it is done ample security for the protection of his adversary against injury. Neither a writ in detinue, nor a writ of attachment for the seizure of property, can be obtained until the person suing it out shall execute an adequate bond, with good sureties, for the indemnification of the defendant against all loss he may thereby unjustly sustain. In courts of equity, writs of injunction and equitable attachment, are allowed only upon like conditions; and a compliance with them is required by express statutory enactments. And whenever either of these writs will afford all needed protection to rights asserted by the plaintiff in a court of equity, and these rights are disputed, it should rarely appoint a receiver to take the property from the defendant; receivers being appointed, ordinarily, without indemnifying bonds being required of those procuring the appointment to be made, and only upon the bond of the receiver with sureties for his fidelity as such. There has

[Briarfield Iron Works Co. v. Foster.]

been, indeed, too much facility on the part of chancellors and registers in the exercise of this authority.

The discretion which they have on this subject must not, however, be too strictly limited. Such is the variety, more or less defined, in the countless cases arising out of human transactions in which redress may be sought in a court of equity, that they can not be so classified as to be subject to rules which shall precisely prescribe for each, when and when not, the power in question should be exerted. Only a few general principles may be regarded as established according to which the power ought to be exercised.

One of these is, that a receiver ought to be appointed only "to prevent fraud, save the subject of litigation from material injury, or rescue it from threatened destruction."—*Baker v. Backus*, 32 Ill. 79; *Voshel v. Hynson*, 26 Md. 92; *Crawford v. Ross*, 39 Geo. 44. Nor should it be done then, until answer to a bill praying it has been made by defendant, "unless the necessity be of a most stringent character."—*Leddell v. Starr*, 4 C. E. Green (N. J.) 159; *Blondheim v. Moore*, 11 Md. 365; *Voshell v. Hynson*, (*supra*); *Sanford v. Sinclair*, 8 Paige, 372; *Gibson v. Martin*, Id. 481.

Of course, also, it ought further to appear from the case made, that the plaintiff is quite clearly entitled to the interest he claims in the property for which a receiver is asked. Although that interest need not be conclusively shown to exist, yet as a general rule the facts alleged, and the exhibits and affidavits in support of them, ought to tend strongly to establish it. The averments, especially, ought not to be uncertain or inconsistent, either as to the interest of plaintiff and those he represents, or to the circumstances of peril which justify the court in a procedure which (as said in *Beverly v. Brooke*, 4 Grattan, 208), "reverses, in a great measure, its ordinary course of administering justice; beginning at the end, and levying upon the property a kind of equitable execution, . . . . . and afterwards determining who is entitled to the benefit of its *quasi* process."

The bill in this cause is prepared with care and consideration. It elaborately suggests much more than it sufficiently charges. It is in many respects uncertain and in some inconsistent. The averments seem to be made almost entirely upon information. Complainant filed his bill as special administrator only, (signing it as sole solicitor for himself,) on the 26th of October, 1874. His appointment was made just one week before, on the 19th of the same month, by the probate court of Marengo county. He does not appear to have been in any way related to Edwin A. Glover, deceased, or to be a creditor of his estate. The property for which he asks

a receiver, and the *situs* or home of The Briarfield Iron Works Company, are in Bibb county. There is nothing to show that he has ever been to that county to inquire into the history of the company, or the condition of its property, or to ascertain from the county records, or books of the corporation, what are the terms of the several mortgages or trust deeds, or what the nature of the transactions, of which he says he knows nothing. And there is no evidence in support of the averments in the bill, except complainant's own affidavit, upon mere information.

Much stress is laid upon the supposed disorganization of the company. It is alleged that in March, 1867, there was an election of a president, of a vice-president, secretary and treasurer, (of one person to these three offices,) and of a number of directors; but that the president removed from the State some years ago, and no other president has been elected; that Mr. Glover, one of the directors, removed out of the State and afterwards died; that no by-laws were ordained for the government of the company; and that there has been no election since the one mentioned. These sound like very serious charges. But when it comes to be known that only a few individuals composed this company; that most of these were elected to the positions just mentioned; that the charter itself did not create any offices, or prescribe at what periods elections should be held, or require the adoption of any by-laws, but left it to the company "to provide for the election of such officers as may be deemed necessary for the government and management of the affairs of the corporation," and "to ordain, establish and put in execution such by-laws, ordinances and resolutions as they shall deem necessary and expedient," a court could hardly hold that this manufacturing corporation was insufficiently organized.— Especially could this not be assumed, when the bill shows that this company has, in fact, been carrying on business, that "large amounts have been realized from the *rents* of said property, and from the manufacture of iron, to-wit, not less than $10,000 *per annum*," and that large sums of money have been borrowed for the company—some from Glover himself, and some from other persons, to whom he by his agent, became liable as surety for the payment thereof by the company—and when, so far as appears, neither Mr. Glover in his life time, nor any other member of the corporation or creditor of it, has ever objected that it was in a condition which made it incapable of transacting business. It is apparent from the record that Mr. Glover continued to participate in its affairs, either personally, or by an agent in

whom he confided, and in harmony with the other parties, long after his removal to Texas.

In respect to the $10,000 a year, or more, above mentioned, complainant says that he "does not know, and has been unable to ascertain, *which*, if *any*, of the officers of said company has received the large annual income derived from the rents and profits, or how the same has been expended. And your orator charges that the affairs of the company have been so managed as to render the stock owned by the said Edwin A. Glover therein of no market value, to make the estate liable for the debts of said corporation to the amount of his stock, and further to cause the said estate to lose a large amount of money lent by the said Edwin A. Glover to said company, and also liable for all, or a large portion of a debt of nearly $40,000 ;" which is afterwards shown in the bill, to be the same debt mentioned in a former part of this opinion, of which plaintiff complains that it was the debt of the individuals who signed the note, including Glover, to John T. Walton, which the company illegally assumed, and executed its mortgage for.   But it is not any where alleged in the bill that any of the stockholders of this company or any of the defendants to this cause, had appropriated this money, or any part of it to his own use, or been guilty of any fraud in respect to it, or in any other particular, or that complainant had used any endeavors, or made any inquiries of these defendants or other persons, to obtain full and correct· information in regard to those matters.   For aught that appears to the contrary, all the money received either as income from the works, or by borrowing, was used in purchasing or improving the very valuable property of the company; of which the mineral lands, about 10,000 acres, are alleged in the bill, to be worth $75,000, and the machinery is estimated to have cost about $100,000.   The adventure certainly appears not to have been fortunate.   But this does not necessarily imply fraudulent mismanagement, or incapacity.

Alike indefinite is a charge on information that " a deed of trust was made to one William White prior to the close of 1873, and that the said William White received as commissions for his services, the sum of $2,000, and had under his control assets belonging to the Briarfield Iron Works Company to a large amount ; but your orator has no information what these assets consisted of, or how or for whose benefit the trust was created—and he is advised that it is his duty as special administrator," &c., " to seek a discovery touching these matters," &c.   Was any examination made of the records in Bibb county, to ascertain the trusts of this deed, or

any inquiries there prosecuted concerning the property embraced by them? It is only the uncertainty in this allegation that can create any suspicion of wrong-doing.

So it is averred near the conclusion of the stating part of the bill, that "orator is informed that the said company has ceased manufacturing iron, steel and castings, has no office or known place of business, and the valuable property at Briarfield is not used in any way; the costly machinery is liable to sustain injury and damage, and that James Crawford has never taken possession of the property," &c. There is nothing, however, to remove the impression created by that part of the bill in which "rents" are spoken of, that the property was in the hands of a lessee, who might find it unprofitable in the depressed condition of the iron trade, mentioned in another place, to operate the factory. Nor is it at all unreasonable to suppose, if the property was not leased, that the company has ceased to run it for the same reason, that it would now be unprofitable to do so. Nor is it alleged that the property was not in the hands of a careful agent. There is no reason to suppose that the company would not take good care of the valuable machinery of this factory, by an agent or otherwise, while it remains unused. The insolvency of the company would not prevent them, or the mortgagees, from doing this. And there is no averment that it is not done. There is, on the contrary, proof made by affidavits that a careful and competent agent had been and was in charge of the property.

Finally, it is brought conspicuously to view in the bill and exhibits, as well as by the affidavits in the record, that this controversy arises out of another in respect to the last will and testament of Edwin A. Glover, deceased. He died in Texas in February, 1874; without any haste, an instrument purporting to be his last will and testament was established as such five months afterwards, (in July, 1874,) in the court having jurisdiction of the matter in Texas. By this will, most of the property of testator was given to his niece, Mrs. Amanda Sterling, who was also appointed executrix; and she is made legatee of his interest in the Briarfield Iron Works. Against this, Pearson J. Glover, of Marengo county, a nephew of testator, claims this property by an alleged subsequent testamentary paper. The bill alleges that "a suit is now pending between Pearson J. Glover and Mrs. Amanda Sterling, in the district court of Waller county, Texas, in which said Pearson J. Glover is seeking to establish and probate the instrument dated the 26th day of November, 1873, as the last will and testament of Edwin A. Glover, deceased, *or a codicil thereto*, and is contesting the validity of

[Briarfield Iron Works Co. v. Foster.]

the instrument dated the 24th day of February, 1872, and is objecting to the probate of the same as the last will and testament of deceased, *unless the instrument he holds is admitted as a codicil thereto, or a part thereof.*" A transcript from the probate court of Marengo county, shows also, that complainant was appointed special administrator, upon the application of Pearson J. Glover, and not of any creditor of Edwin A. Glover.

Of course this court, or the chancellor, cannot now know anything in regard to the ultimate rights of Mrs. Sterling and Pearson J. Glover, respectively, or anything about the legal controversy concerning them, except what is disclosed by this record. But this shows that in July, 1874, the will in favor of Mrs. Sterling was established; that a suit is *now* pending (that is, when the bill was filed October 26th, 1875, a year and nine months after the death of testator,) instituted by Pearson J. Glover, in the same court in which that will was established, to contest the probate of it. What is the condition of this pending suit, when and how it was begun, whether anything more than a petition has been filed, the bill does not inform us; but it shows that Pearson Glover intends to contest the will previously established, "unless the instrument he holds is admitted as a codicil thereto, or a part thereof."

How can it be known that this suit also is not brought in order to aid in effecting such a compromise. We cannot know whether it is or not, and we do not assume that it is. But since the fact of such a controversy and the purpose of it, between Mr. Pearson Glover, and those claiming under the will admitted to probate in Texas, is thus presented upon the record, a court of equity should not interpose by the exercise of its extraordinary powers, without requiring ample security from those seeking it, that no unjust loss shall be inflicted thereby on adverse parties. And the complainant, as special administrator, had the right to require of those desiring these remedies that they should furnish such security.

We do not mean to intimate that this is a case in which, upon such security being given, complainant would be entitled to the aid of some one of the extraordinary writs which a court of chancery, or a chancellor has authority to employ. But we think it clear that the chancellor erred in appointing a receiver in this cause.

And for this error his order making the appointment is reversed and annulled, and the cause remanded.