# *Ex parte* Roundtree.
# *Ex parte* Orr.

*Petitions for Prohibition to Circuit Judge, sitting as Judge of Statutory Inferior Court.*

1. *Judicial construction of constitutional provision.* — When a constitutional provision has received a settled judicial construction, and is afterwards incorporated into a new or revised constitution, it must be presumed to have been retained with a knowledge of that construction; and the courts will, therefore, feel bound to adhere to that construction.

2. *What is "inferior court of law and equity."* — Held, on the authority of *Nugent* v. *The State* (18 Ala. 521), that an "inferior court," which the general assembly is authorized by the constitution to establish, is a court whose judgments or decrees can be reviewed by an appellate tribunal, whether the circuit or the supreme court; and not necessarily a court whose jurisdiction is inferior, or limited, within the meaning of that term at common law.

3. *Constitutional provisions as to election of judges.* — Since the constitution provides that all judges shall be elected by the people (Art. VI. § 11), the general assembly cannot, in creating an "inferior court of law and equity," make the judge of the circuit court, within whose territorial jurisdiction the new court is established, the presiding judge thereof.

4. *Constitutionality of "Law and Equity Court of Morgan county," created by act of December* 17, 1873. — Tested by the principles above declared, the inferior court of record in the town of Decatur, created by the act approved December 17, 1873 (Sess. Acts 1873-4, pp. 68), and called "*The Law and Equity Court of Morgan county*," is unconstitutional, because the judge of the fourth judicial circuit is, by the act itself, declared to be the presiding judge of said court.

5. *When prohibition lies to circuit judge, sitting as judge of statutory inferior court.* This court will interfere by prohibition, to restrain a circuit judge from sitting as the presiding judge of a statutory inferior court, when the act creating that court, and making him the presiding judge thereof, is declared unconstitutional.

APPLICATIONS by petition, by Scott S. Roundtree and Robert F. Orr, respectively, for writs of prohibition to Hon. JAMES S. CLARK, the judge of the fourth judicial circuit, to restrain him from presiding in the "Law and Equity Court of

Morgan county," or taking or exercising any jurisdiction, as
the presiding judge of said court, of a certain cause therein
pending against the petitioner Roundtree, or proceeding
against the petitioner Orr, who had been summoned as a juror.
The said court was established by an act of the legislature ap-
proved December 17, 1873, the material provisions of which
are stated in the opinion of the court.

R. W. WALKER, for the petitioners.

BRICKELL, J. — The constitution vests the judicial power
of the State "in the senate, sitting as a court of impeachment,
a supreme court, circuit court, chancery court, courts of pro-
bate, such inferior courts of law and equity, to consist of not
more than five members, as the general assembly may from
time to time establish, and such persons as may be by law in-
vested with powers of a judicial nature."    Art. VI. § 1.    The
constitution of 1819 vested the judicial power "in one supreme
court, circuit courts to be held in each county in the State, and
such inferior courts of law and equity, to consist of not more
than five members, as the general assembly may from time to
time direct, ordain, and establish."    Under the constitution of
1819, as under the present constitution, the senate was ex-
pressly clothed with jurisdiction to hear and determine all im-
peachments of civil officers ; the general assembly was empow-
ered to establish circuit courts, courts of chancery, and courts
of probate, the jurisdiction of which was defined as in the
present constitution.

Excepting the words, "and such persons as may be by law
invested with powers of a judicial nature," the section of the
present constitution, which we have quoted, simply expresses,
in a single clause, that which was evident from the several
sections of the constitution of 1819, establishing the judicial
department of the government, and distributing the judicial
power.    The words "and such persons as may be by law in-
vested with powers of a judicial nature," were introduced into
the present constitution, from abundant caution.    It was for a
time, under the constitution of 1819, a vexed question, whether
the general assembly could, by enactment, confer such powers
on other than constitutional judicial officers.    The convenience
and interest of the community often demanded the vesting of
such powers in ministerial officers, who could exercise them
more expeditiously than the regular judicial tribunals.    There
were many statutes passed to subserve this convenience and
interest ; among others, statutes authorizing the clerk of the
circuit court, or the register in chancery, to fill vacancies in
trusteeships, by the appointment of trustees.    The validity of

such enactments came before this court, in the case of *Gaines* v. *Harvin* (19 Ala. 491), and was affirmed. These words, therefore, merely declare the judicial construction which the constitution would have borne without them. The present constitution does not differ from the constitution of 1819, in its distribution of the judicial power. Each established a supreme court, circuit court, court of chancery, court of probate, and defined the jurisdiction of each court. Justices of the peace, under each, were vested with a minor civil jurisdiction. Under each, the general assembly " may, from time to time, ordain and establish inferior courts of law and equity, to consist of not more than five members."

. In construing the constitution, we must remember, that it was not made for a community without existing laws; that it was originally made by and for a people, among whom the common law prevailed, and who had statutes, judicial tribunals, a legislature, and all the agencies of government, as recognized and known to American jurisprudence and institutions. The common law, as it prevailed, and the statutes of force when the constitution was framed, it may be necessary to refer to, in ascertaining the proper construction of any particular provision of that instrument.

The division of courts, recognized at common law, was superior, or courts of general jurisdiction, and inferior, or courts of limited jurisdiction. Superior courts derived much of their jurisdiction from the common law. Inferior courts derived their whole existence and jurisdiction from the statutes constituting them. Hence, nothing was intended to be without the jurisdiction of a superior court, whether of appellate or original jurisdiction, except what appeared to be so; and every presumption, consistent with the record, was indulged in favor of the regularity and validity of their judgments; while, of inferior courts, no intendment was made favorable to their jurisdiction, and a conformity to the law of their creation must have been disclosed by their records. Such was the only division of courts at common law, — into superior and inferior. It followed from the character of jurisdiction the courts exercised, and not from the subjection of the court to the appellate power of another tribunal. In this last sense, all courts of original jurisdiction are inferior to a court exercising over them appellate power.

The territorial statute of 1807 (Laws of Ala. 175) created a county court, to be composed of five justices of the quorum, having civil jurisdiction, except of real actions, actions of ejectment, and trespass *quare clausum fregit*, when the value of the matter in controversy did not exceed one thousand dollars. The statute of December 14, 1819, passed at the first session of

the general assembly under the constitution, made changes in this court and its jurisdiction. Laws of Ala. 186. This statute provides, " there shall be established, in each and every county in this State, an inferior court, to consist of five justices, to be appointed," &c. The only change in the civil jurisdiction of the court, was to vest it with jurisdiction of actions of debt and *assumpsit*, concurrent with the circuit court. Its judgments and decrees were subject to revision by the circuit court.

Reading the clause of the constitution leaving to legislative power the creation of inferior courts, in connection with the common-law division of courts, and the statutes referred to, I would be led to the conclusion, that it was not contemplated the general assembly should, in the exercise of this power, establish courts equal in dignity, and concurrent in jurisdiction, with the circuit or chancery courts ; that the courts so established should be inferior courts, both as regards the extent and character of the jurisdiction they exercised, and the relation they bore to the courts of general jurisdiction. The constitution distributes all the jurisdiction known to the common law in general, whether original or appellate, to courts of its own creation. The circuit court has plenary, original, criminal and civil jurisdiction, when the amount involved exceeds fifty dollars ; justices of the peace have exclusive original jurisdiction when the amount in controversy does not exceed fifty dollars. The jurisdiction of courts of chancery is not defined ; we ascertain it by reference to the common law. The jurisdiction of courts of probate is defined as testamentary, and " for orphans' business." The jurisdiction of the supreme court is appellate and revisory, extending to all these tribunals. The general jurisdiction embraced in the term " judicial power " being thus by the constitution distributed, the inferior courts the general assembly may establish were not intended to exercise this jurisdiction, but the judicial power lying within the province of inferior courts, — a limited, qualified jurisdiction.

The constitution carefully guards the independence of the judges of the superior courts, or courts of general jurisdiction, and protects, as far as possible, the community from the prostitution by them of their official influence to the gratification of political aspirations. The judges of the supreme court, chancellors, and judges of the circuit courts receive a fixed compensation, not subject to diminution during their term of office ; and no change in the time or mode of election, or district or circuit, can impair or affect their right to hold office for the full constitutional term. They are prohibited from receiving fees or perquisites, and, during the term for which they are elected, are ineligible to any other than judicial offices. Secure and independent in the enjoyment of their offices, and the com-

pensation attached, they are freed from all dependence on legislative favor, and are above popular prejudice or clamor. Ineligible for the official term to any other than judicial offices, they are removed from all temptation to prostitute the power and influence of their office to the gratification of political aspiration, and a broad line is drawn between judicial station and political office. The inhibition of the reception of fees and perquisites is indispensable to the dignity of the office, and the purity of the exercise of its powers. The judges of the inferior courts are not so carefully guarded and protected, nor under like inhibitions. Their offices are of legislative creation, subject to alteration or abolition at the pleasure of the general assembly. Their compensation may be made to depend on fees and perquisites, and the legislative power to alter, change or diminish them, is unrestrained.

This clear difference and distinction between the judges of courts of general jurisdiction, and the judges of the inferior courts the general assembly may establish, is an additional reason for the opinion I have expressed, that the constitution, in the provision under consideration, contemplated .a court inferior in jurisdiction to the courts of general jurisdiction it created. If this is not true, no reason occurs to me for the difference and distinction between the judges of the two courts, so clearly defined. The judge who tries the accusation, and pronounces final judgment thereon, involving life and liberty, whether he be the judge of an inferior or a superior court, should have his judicial independence, courage, and firmness, carefully guarded, and should feel secure in exercising them. That the constitution affords the protection to the judge whom it clothes with this power, and does not extend it to another, who is to be the judge of an inferior court, shows that its framers did not intend the latter judge to exercise power of such importance to the State, and to the individual under the dominion of its laws.

The general assembly, at its last session, passed an act, approved December 17, 1873, entitled, "An act to establish an inferior court of record in the town of Decatur, Alabama." The first section of this statute establishes in the county of Morgan an inferior court of record, to be called "The Law and Equity Court of Morgan county," to be located and semi-annually held in the town of Decatur. The second section defines the territorial limits within which the court shall exercise jurisdiction, confining it to a part only of the county. The third section enacts, that the court shall have a common seal, a clerk, to be styled the clerk and register, who, at the next general election, is to be elected by the qualified voters of the county, hold his office for the term, be subject to the duties,

and clothed with the powers of a clerk of the circuit court, and with the powers and duties of a register in chancery, so far as the court has equity jurisdiction; vacancies in the office of clerk are to be filled as vacancies in the office of clerk of the circuit court. The process of the court at law is conformed to the process of the circuit court, and in equity to the process of the court of chancery. The court is vested with concurrent jurisdiction, within the prescribed territorial limits, with the circuit court, at law and in equity, civil and criminal. The judge of the court has power to issue all remedial writs, legal or equitable, which a judge of the circuit court can issue. Juries, grand and petit, drawn and empanelled from the territory subject to the jurisdiction of the court, are authorized. The sheriff, coroner, constables of the county, and county solicitor, are required to attend the terms of said court. The venue in any cause, civil or criminal, pending in said court, may be changed to the circuit court of Morgan county, or to any other circuit court; and the venue in any cause, civil or criminal, pending in the circuit court of Morgan county, may be changed to the said court. The times of holding the regular terms of said court are fixed, and the judge thereof can order and hold special terms. The fifteenth section declares, " that the judge of the fourth judicial circuit of Alabama shall be the judge of said court of law and equity."

This court has all the elements and all the instrumentalities of a court of record of general jurisdiction. Within the territorial limits prescribed, it is in jurisdiction, in dignity, in machinery, in officers and process, coequal with the circuit court. It can be termed an inferior court only, because the eighth section of the statute creating it subjects it to the appellate and supervisory jurisdiction which this court can exercise over the circuit courts and courts of chancery. As above indicated, uncontrolled by the judicial exposition this clause of the constitution has received, I would incline to the opinion, that the general assembly could not establish this court — that it is not an inferior court within the meaning of that term as used in the constitution. The question was the subject of deliberate consideration in *Nugent* v. *State* (18 Ala. 521), and it was declared that a court, the judgments of which were subject to revision by a higher tribunal, was an inferior court within the meaning of this clause of the constitution; that it is the relation the court bears to the superior tribunal, and not the character or extent of its jurisdiction, which is contemplated. The conclusiveness of this decision has never been questioned. It has been repeatedly acted on by the general assembly, and acquiesced in by this court. With full knowledge of it, the same provision, in the same terms, was incorporated in the present

constitution. We are not at liberty, therefore, to depart from it, and must pronounce it within legislative competency to ordain and establish an inferior court, clothed with the jurisdiction the statute confers on this court.

The constitution declares ; " Judges of the supreme court, and chancellors, judges of the. circuit and probate courts, and of such other inferior courts as may be by law established, shall be elected by the qualified electors of the respective counties, cities, towns, or districts, for which said *courts may be established," &c. " Vacancies in the office of the circuit judge, judge of probate, or judge of any other inferior court established by law, shall be filled by the governor," &c. Const. Art. VI. § 11. The language of the constitution is clear and unambiguous. The judge or judges of an inferior court must be elected by the qualified voters of the district subject to the jurisdiction. They are deemed to have an especial and peculiar interest in determining who shall, as judge of such court, be intrusted with the administration of the laws to which they must yield obedience, and from which they desire protection. The judges of the supreme court, which has jurisdiction coextensive with the territorial limits of the State, are to be elected by the qualified voters of the State. The State must, by the general assembly, be divided into convenient circuits, each circuit having not less than three, nor more than eight counties, and for each circuit the judge must be chosen by the qualified electors of the counties composing the circuit ; and after his election, he must reside therein. Const. Art. VI. § 4. The general assembly is commanded to divide the State into chancery divisions and districts ; and for each division, a chancellor is to be elected by the qualified electors thereof, and after his election must reside therein. A court of probate is established in each county, the judge of which must be elected by the qualified voters of the county. The whole theory of the constitution is, that the qualified electors shall, by ballot, under the forms of law, determine who shall exercise the judicial power which is to be exercised within the territorial boundaries in which they reside. The election to judicial office is intrusted wholly to them, and is, in effect, forbidden to the legislative department of the government. From their election only can be derived the right to hold and exercise the power of that office. Claiming such right, and exercising such power, under any other authority than that of their election, is mere usurpation. The general assembly can as well declare who shall be the judges of this court, or the judges of the several circuit courts, or the chancellors, or the judges of probate, as to declare who shall be the judge, or the judges, of an inferior court they may ordain and establish. Either is a violation of

the constitutional mandate, and a departure from the theory and policy the constitution is framed to promote. Either would wrest from the qualified electors the power of determining a matter in which they have a vital interest, — who shall administer the law, and exercise over them judicial power.

It is true, as is urged in argument, that the county of Morgan composes a part of the fourth judicial circuit of the State, and that the judge of that circuit was elected by the qualified voters of Morgan and the other counties composing the circuit; that he is, therefore, a judge deriving his authority from an election had pursuant to the constitution. This cannot satisfy the constitutional mandate. He was not elected the judge of this inferior court, and the statute does not propose that he shall ever be so elected. By virtue of his election as judge of the circuit court, he is to be the judge of the inferior court. The qualified electors, residing within the territorial jurisdiction of this inferior court, have never elected, and never can elect him, as judge of that court. Indeed, they may all vote against his election as judge of the circuit court, and, of consequence, his election as the judge of this inferior court; and yet, because of the large vote he receives elsewhere in the circuit, he may be elected. Thus the qualified electors, residing within the territorial limits over which this inferior court has jurisdiction, are shorn of the power the constitution confers on them, and on them alone, — a power not to be defeated or denied to them, by compelling them to exercise it in conjunction with others.

The general assembly has full power to change the circuits of the State. It may detach the county of Morgan from the fourth circuit, and add it to the fifth, whenever it may be deemed expedient. Suppose the change is made, and a general election occurs; the qualified electors residing within the territorial limits over which the inferior court exercises jurisdiction, vote for, and aid in the election of a judge of the fifth judicial circuit, but have no voice in the election of a judge of the fourth judicial circuit. The judge of this inferior court — a court established for a district defined with exactness — would not be elected by the voters of that district. They could have no agency or influence, direct or remote, in his election, in defiance of the constitutional mandate, that he must be elected by the qualified voters of the district for which the court is established. It seems to us clear that this statute proposes, by mere legislative enactment, to take from the qualified electors the power of electing the judge of this court, and by such enactment to fill the office. This is forbidden by the constitution. There is no event, or contingency, in which the general assembly can, by any resolution or enactment, designate the incum-

bent of a judicial office. Such power is expressly intrusted to the voters at an election; or, if a vacancy occurs after an election, to the governor.

If the statute creating this court could be properly construed as merely imposing on the judge of the fourth circuit additional duties, not as creating a court distinct from and independent of the circuit court, the objection to its validity would not be removed. The necessity of an election to the title of judge remains. If it is an inferior court, within the meaning of the constitution, the election, which confers the title, must be made by the voters of the district for which it is established. An election by the voters of this district, in connection, or in common with the voters residing in the other parts of Morgan county, and with the voters of five other counties, is not the election prescribed by the constitution. The election of the judge, as the judge of the circuit court, can no more be deemed a compliance with the terms of the constitution, entitling him to hold an inferior court, than his election as judge of the inferior court could be deemed to entitle him to hold the office of judge of the circuit court. Neither is the election the constitution contemplates. It is not an election only the constitution requires, but an election by the qualified voters of the circuit or district for which the court is established. One election cannot entitle the judge to hold two distinct and independent offices. If this construction of the statute was admissible, we would be compelled to declare it an infraction of the constitution. The constitution contemplates only one circuit court in each county. If, under the pretext of enlarging the duties of a judge of the circuit court, the general assembly could, by resolution or enactment, compel or authorize him to hold terms of a court concurrent in jurisdiction with the circuit court, and vest him as judge of such court with all the powers he can exercise as judge of the circuit court, the judicial business of a county could be drawn from its legitimate centres, — parcelled out into as many parts as the legislative will should prescribe, and in fact, for all practical purposes, more than one circuit court exist in each county.

Without violence to the terms of this statute, and a manifest perversion of all its objects and purposes, it cannot be deemed a mere enlargement of the duties of the judge of the circuit court of the fourth circuit. It creates a new court, independent of, and distinct from the circuit court. It is styled an inferior court of record, to be known as the "Law and Equity Court of Morgan county." It has its own clerk, its own records, and exercises its own jurisdiction. The judge of the court, as such judge, can issue all the remedial writs which he as circuit judge can issue. If judicial construction, to avoid

the force of constitutional restraints and limitations, could interpret this statute into a mere increase of the duties of a judicial officer, and not as the creation of a judicial tribunal, it is in vain the people have reserved power to themselves, or restrained legislative action.

The decisions in the cases of *Bulkrun* v. *State* (40 Ala. 671), and *Randolph* v. *Baldwin* (41 Ala. 305), are not inconsistent with, but support the views we have expressed. The courts, the jurisdiction of which was involved in those cases, were presided over by a judge deriving his title from an election by the qualified voters only of the districts for which the courts were established. It is apparent, if such had not been the fact, the jurisdiction of the courts would not have been maintained.

We are constrained to declare the section of this statute, declaring the judge of the fourth circuit the judge of this court, a violation of the constitution.

A writ of prohibition is a preventive, rather than a corrective remedy. Its purpose is to prevent the usurpation or excess of jurisdiction by judicial tribunals, and to keep each court within the limits to which the law confines it. Though it has been most often addressed to recognized tribunals, having a defined jurisdiction, which they were exceeding, or to prevent them from encroaching on the jurisdiction of other tribunals, we do not doubt that, in the absence of any other adequate remedy, it lies to prevent unauthorized individuals from usurping judicial power. *State* v. *Hudnall*, 2 Nott & McC. 419; *State* v. *Simons*, 2 Speers, 761. It is said by Holt, C. J., in *Chambers* v. *Sir John Jennings* (2 Salk, 553), cited in 8 Bac. Abr. 228, that a prohibition will lie to a pretended court. If the court is one of established jurisdiction, a plea that the subject-matter of a particular suit lies without its jurisdiction, or that the party is not amenable to its cognizance, will ordinarily afford full relief. But, when the question involves the legal existence and construction of a court — a denial of all jurisdiction, and not of the particular jurisdiction proposed to be exercised — a prohibition, it seems to us, is the only adequate remedy. A plea, in such case, would present a question which a court only could decide, and would call upon a supposed court to pronounce a judgment, which a real court only is capable of pronouncing.

The usurpation of judicial power — the holding of pretended courts — is a great public wrong, productive of uncertainty and confusion; beclouding the title to property, vexing and harassing the citizen, involving him in a conflict of duties, subjecting him to oppression, and detracting from the dignity and authority of the known and established tribunals. It would be a

reproach to the law and to justice, if there was not a speedy remedy to prevent such usurpation.

We therefore deem prohibition the appropriate remedy, to prevent the holding of this unauthorized court, and the subjecting the petitioners to its process. The result is, the rules *nisi*, heretofore awarded, must be made absolute, and writs of prohibition, as prayed for by the petitioners, will issue.