SEABOARD AIR LINE RY. CO. et al. v. RAILROAD COMMISSION OF ALABAMA et al.

(Circuit Court, M. D. Alabama.   July 14, 1907.)

1. CORPORATIONS—FOREIGN CORPORATIONS—EXCLUSION FROM STATE.

The state, unless forbidden by its own Constitution, or estopped by its dealings with a particular corporation, or a right has vested in such corporation to do business in consequence of contracts and investments made on the faith of state statutes, may at any time, and for any cause, exercise its sovereign, political, prerogative of preventing, at its own pleasure, any foreign corporation from doing a domestic business in its borders.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 2505.

Exclusive regulation and taxation of foreign corporations, see note to McCanna & Fraser Co. v. Citizens' Trust & Surety Co., 24 C. C. A. 13.]

2. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS—FOREIGN CORPORATIONS.

Section 240 of the Constitution of Alabama of 1901, which gives the right to foreign corporations "to sue in all courts, in like cases, as natural persons," prohibits any court from giving effect to an enactment which provides that the bringing of a suit by a foreign corporation in the federal court shall ipso facto forfeit its right to do domestic business in Alabama, when, under the law of the land, no such consequence attaches to a domestic corporation or a natural person for bringing a like suit. The fourteenth amendment also annuls such a statute, since its enforcement would amount to a denial of the equal protection of the laws to the foreign corporation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 678.]

3. SAME—OBLIGATION OF CONTRACTS.

Where state statutes provide that a domestic corporation may sell "all its property, roadbed, rights and franchises" to a foreign railroad corporation, and such property, when so purchased, "shall be subject, in all respects, to the laws of the state as if owned by a domestic corporation," and set forth other terms upon which such foreign railroad corporation may lease, operate, and aid domestic railroad corporations, the provisions of such statutes enter into and form part of the obligation of the contracts made thereunder between the domestic railroad corporation and the foreign railroad corporation.

4. SAME—VESTED RIGHTS—ESTOPPEL.

The state, after foreign corporations have invested large sums of money, and made contracts in the purchase and lease of domestic railroads, and in carrying on domestic and foreign commerce, on the faith of such statutes, cannot deny or impair the enjoyment of the vested right, thus ac-

quired, to do such business, by the exercise of its arbitrary prerogative, which might otherwise exist, to prevent foreign corporations, at its pleasure, from doing a domestic business in its borders. The state is estopped, by the acceptance of the proposals made in its own laws and acts done on the faith thereof, to claim or exercise such a prerogative thereafter; and it is also forbidden to exercise it, because the denial to the foreign corporation of the right to do domestic business would be a denial or impairment by the state of the obligation of contracts, which the Constitution of the state and United States forbids the state to effect by any law.

[Ed. Note.—Estoppel against, see notes to State v. Jackson, L. & S. R. Co., 16 C. C. A. 353.]

5. SAME—DUE PROCESS OF LAW.

After such purchase and lease of domestic railroad property by foreign railroad corporations, their owners and lessees hold them, with the right to operate them in both domestic and interstate commerce, for the time and upon the conditions the law provided, and the state cannot interfere with any lawful use of such property by the foreign corporation, except by forfeiture of the right so to use the property, for misuser or nonuser, for cause defined by law, applicable alike to all persons similarly situated, and only after hearing and judgment in the courts.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, §§ 762, 763.]

6. CONSTITUTIONAL LAW—POLICE POWER.

The police power is limited to the prevention and punishment of such acts as may, or do, menace the welfare, happiness, morals, or peace of the state, and the people within its borders, and as these cannot be invaded or imperiled by the exercise of the right to resort to a federal court, which is given by the supreme law of the land, no court can recognize the bringing of such a suit as any legal cause for the forfeiture of any vested right of property.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 148.]

7. CARRIERS—REASONABLENESS OF RATES—BASIS OF CALCULATION.

Under the fourteenth amendment, the basis of all calculations as to the reasonableness of rates charged by a railroad must be the fair value of the property used by it for the convenience of the public; and, as to rates prescribed for transportation of persons and property carried only within the limits of the state, the reasonableness of such rates must be based upon the value of the property devoted to domestic commerce, without reference to the value of the property devoted to interstate commerce, and neither the profits nor the losses in the one business can be estimated in determining the reasonableness of the rates as to the other.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 19.]

8. SAME—DETERMINATION.

As the Constitution forbids rates to be fixed unreasonably low, a court, when asked to enjoin the enforcement of rate legislation, on the ground that it violates the Constitution in this respect, must necessarily ascertain the facts upon which the reasonableness of the rates depends before it can pronounce upon the validity of the statute.

9. INJUNCTION—UNREASONABLE RATES—IRREPARABLE INJURY.

Rates fixed by statute are prima facie reasonable, and the burden devolves upon him who complains of them to show to the contrary. When, upon application for preliminary injunction, complainant shows a state of facts, which, taken in connection with the opposing evidence, presents a reasonable probability that the rates may be adjudged invalid on final hearing, the court, acting for the best interest of all concerned, in view of the facts of the particular case, will balance the relative harm which may befall the adverse interests from the issue of the writ, and grant or withhold the writ accordingly. Under the facts of this case, the com-

plainants showing a prima facie case of irreparable injury, if the operation of the statute be not suspended, while the interests of the public can be protected by the exaction of bonds to refund amount of any excess rate if complainants finally be cast in the suit, preliminary injunction against the enforcement of the rate legislation issued upon those terms.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, § 305.]

10. CARRIERS—REASONABLE RATES.

One of the most satisfactory modes of arriving at the harmful or beneficial effect, upon the revenues of corporations, of the operation of the statutes reducing rates, is to take the gross and net income for the years just preceding the enactment of the statute, if it be probable that the business will continue in substantially the same volume, and at the same cost, and compare the results in the prior years under the prior laws, and the results which would have been effected, if the reduced rates had been applied to such business.

11. SAME.

In order to ascertain whether the reduced rates would be harmful or beneficial, the court may, in case of doubt, order them tested by actual operation; but such experimentation with the property of any one is never justifiable in any case, where the facts presented on the preliminary hearing show only a moderate income under the former law, and a very strong probability of deficiency, or scant earnings, at best, under the reduced rates.

12. STATES—ACTIONS AGAINST.

A suit against an individual, although he be a state official, to prevent him from effecting the destruction of property, or the impairment of property rights, under color of an unconstitutional law, is not a suit against the state, within the meaning of the eleventh amendment to the Constitution of the United States.

(Syllabus by the Court.)

## In Equity.

The Seaboard Air Line Railway, the Atlantic Coast Line Railroad Company, the Kansas City, Memphis & Birmingham Railroad Company, the Southern Railway Company, Central of Georgia Railway Company, the Nashville, Chattanooga & St. Louis Railway Company, the Louisville & Nashville Railroad Company, all foreign corporations, the Western Railway of Alabama, the Alabama Great Southern Railroad Company, the Mobile & Ohio Railroad Company, the Atlanta & Birmingham Air Line Railway Company, and the South & North Alabama Railroad Company, domestic corporations, operating railroads in this state, filed their bills in the United States Circuit Court for the Middle District of Alabama, on the 25th day of March, 1907, against the Railroad Commission of Alabama and the Attorney General of Alabama, praying on final hearing to suspend and enjoin the enforcement of four statutes passed at the present session of the Legislature. One of these statutes fixed 2½ cents per mile as the maximum rate for intrastate passengers. Another classified and fixed the maximum rates for intrastate transportation of 110 commodities. Another provided that the rates in force on the 1st of January, 1907, should be the maximum intrastate freight rates on the articles not included in the other statutes. The fourth statute provides that the bringing of a suit by a foreign corporation in the federal court "shall ipso facto forfeit all its right or license to engage in or carry on business, originating and terminating in this state, of freight or passengers, and its right or license to engage in or carry on such business in this state shall by said act itself be revoked and shall cease." The statutes as to freight and passenger rates provide severe penalties for their violation in each instance by fine or imprisonment, and other laws make it the duty of the Railroad Commission and the Attorney General to enforce the provisions of these statutes. All the corporations, both domestic and foreign, sought relief against the three first-named statutes. All the foreign corporations sought relief against the statute forbidding their doing a domestic business in consequence of bringing a suit

in this court. Only two of the complainants sought a preliminary injunction to prevent the enforcement of the act which makes the rates in force on the 1st of January, 1907, the maximum freight rates thereafter, and they asked a preliminary injunction against its enforcement. As no order was made in those cases pending further investigation, no statement is necessary as to the rights claimed by them in that behalf. All the complainants asked a preliminary injunction against the enforcement of the statute reducing the passenger rates and the rates on 110 commodities. Each of the bills alleges that the enforcement of the several statutes would either confiscate complainants' property or deprive them of any adequate return on the value of the property devoted to intrastate business or deprive them of property without due process, deny to them the equal protection of the laws, and impair the obligation of contracts. A restraining order was issued on the 30th of March, 1907, and the hearing for preliminary injunction went over until the 8th of May, 1907. No answers having been filed in the cases, the issue of preliminary injunction was taken up on the allegations of the sworn bills of the 8th of May, 1907; no opposing evidence by way of affidavit or otherwise being offered.

L. F. Parker and John P. Tillman, for St. Louis & S. F. R. Co.

A. P. Thom, Alex. P. Humphrey, and James Weatherly, for Southern Ry. Co.

H. L. Stone, Gregory L. Smith, and Geo. W. Jones, for Louisville & N. R. Co.

John P. Tillman, for Atlanta & B. A. L. R. Co. and Seaboard Air Line Ry. Co.

A. G. Smith, for Alabama Great Southern R. Co.

A. A. Wiley and W. E. Kay, for Atlantic Coast Line R. Co.

Claude Waller, for Nashville, C. & St. L. Ry. Co.

Lawton & Cunningham and R. E. Steiner, for Central of Georgia Ry. Co.

Geo. P. Harrison, for Western Ry. of Alabama.

E. L. Russell and S. R. Prince, for Mobile & O. R. Co.

Alex. M. Garber, Atty. Gen., R. W. Walker, H. C. Selheimer, S. D. Weakley, Horace Stringfellow, and F. S. White, for respondents.

JONES, District Judge. These preliminary injunctions concern matters of vast public moment. The court had no opportunity at the time they were granted to file an opinion, and does so now. Clearly, if the act of March 6, 1907, which, upon the institution of these suits, ipso facto forfeits the right of complainants to do intrastate business, can be upheld, there is no equity in complainants' bills, except as to antecedent transactions in domestic commerce. After the taking effect of the statute, if it be constitutional, complainants would have no right to enjoin the enforcement of rates in future for carrying on business, in which they would then have no right to engage. The question is one of pure law, and lies at the very threshold of the litigation. While courts are reluctant on preliminary hearing to pronounce upon the constitutionality of a statute, litigation frequently presents phases, of which this is an illustration, when a court is compelled to do so. The obvious fact that the statute recks little of consequences, and that its enforcement would disorder industry, trade, and travel, and entail great hardship and loss in many ways upon communities and thousands of individuals, by depriving them of their usual means of transportation in their intercourse and commerce within this state, sheds no light

whatever upon the authority of the Legislature to enact the statute. The wisdom or unwisdom of the statute is a question the Constitution commits solely to the discretion and judgment of the lawmakers. The courts, whatever may be their view of the policy of a statute, must uphold the enactment, regardless of consequences, unless the Legislature in its passage infringed some express prohibition or necessary implication of the state or federal Constitution. Unless thus restrained, the legislative power of the state is supreme.

## Section 240 of Constitution of Alabama.

Among other provisions of the Constitution of Alabama, bearing upon this matter, is section 240, which ordains:

"That all corporations shall have the right to sue, and shall be subject. to be sued in all courts, in like cases, as natural persons."

This provision is found at the close of the article regulating "foreign corporations" and "corporations chartered under the laws of this state." The framers of the Constitution were well aware that from the foundation of the state foreign corporations had exercised the right to resort to the federal court. If there had been a purpose to prevent their doing so in future, naturally those who made the Constitution would have said so in so many words, or at least limited the right to sue "in all courts of the state." They chose, however, in conferring the right to use the broad words "all courts." There is nothing which authorizes us to reject the popular meaning, in which sense, unless the contrary in some way appears, words in the Constitution must always be taken. Clearly these sweeping words refer to all the courts which dispense justice in the state, and give to "all corporations" the right to enter every court in which a natural person could sue. Aside from the construction which must result from the rule that the framers of a Constitution know the force of words, and employ fit language to express their intentions, reasons are not far to seek, if the court could search for them outside of the plain and unambiguous words, to show that the intent of the authors of this provision was to apply the words "all courts" to the federal, as well as state, courts. The "stranger in a strange land" always values the right to resort to the tribunals which the Constitution of our forefathers wisely provides for him, if he becomes involved in litigation in his adversary's home. Strangers frequently will not invest their money or do business in communities which are known to be hostile to this policy of the Constitution. This section, by giving foreign corporations the constitutional right to resort to "all courts" on equal terms with natural persons, whom other sections give the absolute right to resort to all courts, would prevent future Legislatures from hampering the right to resort to the federal courts, as had been done in some other states. It would be an assurance to all who thought of casting their fortunes with us that Alabama would not depart from its traditional policy, and expel foreign corporations if they chose to exercise the same rights as natural persons to resort to the federal courts. Natural persons and domestic corporations can resort to a federal court in cases arising under the Constitution and laws without subjecting themselves, so far as the state laws

can affect the right to suit in a federal court, to any forfeiture of the right to pursue any business; while under the identical circumstances the foreign corporation can be expelled from the state. Five domestic corporations have filed their bills attacking this same rate legislation. Under this statute they lose no right whatever by so doing; while ipso facto it forfeits the right of the foreign corporations to use property worth millions of dollars in domestic business because they brought a like suit here. If the Legislature may subject a foreign corporation to loss or damage for bringing such a suit here, when no such consequence can attach to a domestic corporation or a natural person, it needs no argument to prove that the right of the foreign corporation to sue "in all courts in like cases," is not the same as that of "natural persons." The statute destroys the perfect equality in this respect which this section exacts, and subverts the declared policy of the Constitution. There is nothing in the nature of the suit which can justify putting the foreign corporation in one class, and other suitors in a different class, in order to attach different consequences to the bringing of suits by them in a federal court. If, however, it were a case where, ordinarily, the Legislature might classify them differently for such a purpose, legislative power to so classify was denied, when the Constitution itself, by a mandatory provision, put all kinds of corporations in one and the same class with natural persons, and gave them the same, identical right as to waging suits "in all courts."

## Prerogative to Expel Limited.

The otherwise absolute prerogative to expel a foreign corporation at will is, by this provision, shorn of all power to expel a corporation, because it resorts to any court. The arms of the prerogative cannot reach out and throttle the enjoyment of rights which the Constitution declares shall exist and shall be enjoyed. The constitutionality of a statute leveled at the enjoyment of a right "must be determined by its natural and reasonable effect" upon the exercise of the right. Henderson v. Mayor, 92 U. S. 259, 23 L. Ed. 543 ; Chy Lung v. Freeman, 92 U. S. 275, 23 L. Ed. 550. It is also a maxim of constitutional law that "what cannot be done directly, cannot be done indirectly." Cummings v. Missouri, 4 Wall. (U. S.) 277, 18 L. Ed. 356. A statute which declares that a corporation is ipso facto expelled, because it resorts to a federal court, or any other court, is ipso facto a defiance of the constitutional provision; for it is an attempt to expel the corporation for doing something which the Constitution gives it an express right to do. The Constitution is the sovereign. The government it regulates can have no prerogative to take away that which the sovereign gives. Else, what the power or good of the Constitution? The Legislature by this penalty upon the exercise of the right, which it cannot directly take away, cannot despoil a corporation of the enjoyment of a right the Constitution gives it. Greene v. Briggs, 1 Curtis (U. S.) 327, Fed. Cas. No. 5,764; Almy v. California, 24 How. (U. S.) 173, 16 L. Ed. 644. The penalty is aimed at the exercise of a constitutional right. The statute puts in the same plane wrongful and vexatious suits and meritorious and successful litigation. It is not an endeavor to prevent vexatious and unfounded litigation by imposing a penalty in event of failure

of the suit. It is a mere naked effort to terrorize foreign corporations and thus prevent them from resorting to the federal court in any event, whether rightly or wrongly, by imposing enormous penalties if they do so, no matter how well-founded their cause of action. This phase of the matter, quite apart from the limitation the Constitution puts upon the discrimination in this respect between foreign corporations and natural persons, places the penalty outside the pale of the Constitution, and compels the court to strike it down. To effect the expulsion of the foreign corporation, there must be some valid declaration of the legislative will to that effect. The only statute we have is not only unconstitutional, but it acts automatically, only upon the happening of the suit. Even if it were valid, it contains no command and expresses no policy whatever as to the expulsion of the foreign corporation in any other event, or for any other cause. The only expression of the legislative will is that the bringing of the suit ipso facto expels the corporation. It stops there. There is silence as to the legislative will in every other particular regarding the expulsion of foreign corporations. The Legislature having no power to pass the enactment, the statute is a mere nullity, and the right of the foreign corporation to remain stands as though the act had never been passed. We cannot bring the dead statute to life, and say that, as the Legislature had power to expel the corporation for some other reason, we must construe this unconstitutional statute, which ipso facto expels the corporation in one event only, as stretching out to any other cause, and, because some other reason might exist, ipso facto expelling the corporation for that other reason. If the court did that, it would usurp the legislative prerogative, and create and invent a command which the Legislature never gave, or intended to give, in order to nullify the constitutional veto upon the statute actually passed. State v. Buckley, 54 Ala. 622; United States v. Reese, 92 U. S. 214, 23 L. Ed. 563.

### Construction of Constitutional Provision by Supreme Court of Alabama.

More than a quarter of a century ago the Supreme Court of this state, in Railroad Company v. Morris, 65 Ala. 199—which involved a discrimination between the rights of a domestic corporation and a natural person in the courts—after referring to a provision identical with section 240 and various other provisions repeated in the present Constitution, declared:

"The clear, legal effect of these provisions is to place all persons, natural and corporate, as near as practicable, upon a basis of equality in the enforcement of their rights in the courts of this state, except in so far as may be otherwise provided in the Constitution. * * * Nor can it be permitted that litigants can be debarred from the free exercise of this constitutional right by the imposition of arbitrary, unjust, and odious discriminations, perpetrated under the color of establishing peculiar rules for a particular occupation. Unequal, partial, discriminatory legislation, which secures a right to some favored class or classes and denies it to others, who are thereby excluded from that equal protection designed to be secured by the general law of the land, is in clear and manifest opposition to the letter and spirit of the foregoing provisions."

The same question, involving a discrimination against a foreign corporation as a suitor in the courts, came before the Supreme Court

of Alabama, in Smith v. Railroad Company, 75 Ala. 451, which followed and reaffirmed the doctrine declared in Railroad Company v. Morris, supra. In the Smith Case, Chief Justice Stone, delivering the opinion of the court, said:

"This question, however, would seem to be settled by our own state Constitution (article 14, § 12), carried forward in identical words in section 240 of the present Constitution, which ordains that 'all corporations shall have the right to sue, and shall be subject to be sued, in all courts, in like cases, as natural persons.' 'In like cases, as natural persons,' must mean where the cases are alike, the same description of contract or tort; there must be no discrimination between corporations and natural persons in the matter of prosecuting or defending suits. * * * The sum of these provisions is that no burden can be imposed upon one class, natural or artificial, which is not, in like conditions, imposed on all other classes."

The same rule was enforced by the Supreme Court of the state in the subsequent cases of L. & N. R. R. Co. v. Baldwin, 85 Ala. 627, 5 South. 311, 7 L. R. A. 266, Brown v. A. G. S. R. R. Co., 87 Ala. 370, 6 South. 295, Randolph v. Builders' & Painters' Supply Company, 106 Ala. 511, 17 South. 721, in each of which statutes making the forbidden discrimination between corporations and other suitors were adjudged unconstitutional. See, also, Durkee v. Janesville, 28 Wis. 464, 9 Am. Rep. 500; Wally's Heirs v. Kennedy, 2 Yerger (Tenn.) 554, 24 Am. Dec. 511; Holden v. James, 11 Mass. 396, 6 Am. Dec. 174; Missouri v. Lewis, 101 U. S. 22, 25 L. Ed. 989; Railroad Company v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666.

The provision now embodied in section 240 of the Constitution appeared for the first time in Alabama in the Constitution of 1875, and is incorporated in identical words in the present Constitution. In Ex parte Roundtree, 51 Ala. 42, the Supreme Court of this state held:

"When a constitutional provision has received a settled construction, and is afterwards incorporated into a new or revised Constitution, it must be presumed to have been retained with a knowledge of that construction, and courts will therefore feel bound to adhere to that construction."

· We have here, not only the settled construction by the highest court of the state of the meaning of a constitutional provision, but the adoption of that construction by the framers of the Constitution themselves. This settled construction of the scope and effect of a constitutional provision, by the highest court of the state, is binding upon every federal court. As said in Gatewood v. North Carolina, 203 U. S. 541, 27 Sup. Ct. 170, 51 L. Ed. 305:

"It is elementary that, under such circumstances, we must follow the construction given by the state court, and test the constitutionality of the statute under that view."

If, therefore, there be any conflict between the courts' holding on this point and the general doctrine declared in Life Ins. Co. v. Prewitt, hereafter cited, the Supreme Court of the United States and all other courts, as to all cases of the kind, arising in Alabama, must follow and apply the views of the highest court of the state, regardless of what might be their own view in the exercise of an independent judgment. Smiley v. Kansas, 196 U. S. 445, 25 Sup. Ct. 289, 49 L. Ed. 546; Armour Packing Co. v. Lacy, 200 U. S. 226, 26 Sup. Ct. 232, 50 L. Ed. 451.

When State May Exercise Sovereign, Political, Prerogative of Expelling Foreign Corporation at Will.

The validity of this statute, as applied to complainants, is challenged under several provisions of the Constitution of the United States. Unless the Constitution of the state forbids, or the state, by its laws or dealings with a foreign corporation, has disabled itself from exercising the right, there is no hindrance, arising under the Constitution of the United States, to a state's forbidding any foreign corporation, not engaged in interstate commerce, from coming into the state in the first instance, or from afterwards preventing such corporation from doing a domestic business, though at the time of its entry the state's laws did not forbid, and the state made no objection otherwise. Such corporations have no right to migrate from the state where they were chartered and enter another state, and do business there without its consent. Ordinarily they come and remain as a matter of grace, and their expulsion violates no right secured to them by the Constitution and laws of the United States. All their contracts, save in the exceptional cases stated, are made subject to the right of the state to expel them at pleasure. As "the laws which exist at the time and place of the making of the contract, and where it is to be performed, enter into and form part of it," their contracts are made subject to the exercise of the right, and their expulsion after coming into the state and making contracts does not, therefore, deprive them of property without due process, or deny them the equal protection of the laws, or impair the obligation of their contracts, at least so far as they are concerned. The state, ordinarily, having the right, with or without reason, at its uncontrolled pleasure, to expel the foreign corporation, may do so, after the corporation has entered the state, by a law subsequently enacted which gives the resort to the federal court as the reason for the passage of the statute.

In view of the consideration that no right of a foreign corporation is invaded, save under special circumstances, by the state's refusing to allow it to continue to do business in its borders, the Supreme Court has held in general, in the absence of prohibitions in the Constitution of the state, that the state may compel a foreign corporation "to abstain from the federal court, or cease to do business in the state," without stating any reasons for its action. "The fact that it may give what some may think a poor reason, or none at all, for a valid act, is immaterial." Life Insurance Company v. Prewitt, 202 U. S. 253, 26 Sup. Ct. 621, 50 L. Ed. 1013. This was held in reference to a statute of Kentucky, which, without requiring any agreement to abstain from the federal court, "merely said to the foreign corporation, if it chose to exercise its rights to resort to the federal court, its right to do further business in the state should cease." The whole theory and reasoning of that decision is based upon the consideration that the corporation, having acquired no vested right to do business in the state, was subject to the exercise by the state of its arbitrary power of expulsion, whether for a good or bad reason. That case dealt solely with the expulsion of an insurance company, which was doing business in the state simply by the grace of the sovereign, and touched upon no

other phase of the right of the foreign corporation to remain in the state, under other circumstances. It was not treating of any question of the forfeiture of property or vested rights of the foreign corporation, or of the right to use its property in a particular business, when the property was purchased by a corporation under special laws relating to it, whose terms were inconsistent with any reservation of the arbitrary power to expel, and where the carrying on of such business, from the very nature of the property, was the thing which gave it value, and which, when forbidden, impaired the obligation of contracts.

### State May Abandon or Lose Right to Expel a Foreign Corporation at Pleasure.

Plainly there is nothing in what was actually decided in Insurance Company v. Prewitt, supra, or in its reasoning, which conflicts with the long and unbroken line of decisions, of the Supreme Court, up to its last sitting, that a state may by its course of conduct towards a foreign corporation estop itself from exercising this arbitrary sovereign prerogative, in particular cases, and that by force of contracts and completed transactions, made under the authority of the state's laws, vested rights of property may be created in the foreign corporation, which the Constitution of the United States protects against impairment or defeat, by the arbitrary exercise of the state's sovereign or political right of expulsion, as distinguished from the legal right of expulsion for cause. Do not both conditions concur here? Davis v. Gray, 16 Wall. (U. S.) 232, 21 L. Ed. 447.

To rightly answer these questions, we must recall the circumstances and laws under which the foreign corporations entered the state and acquired the property, the use of which the statute now seeks to prevent.

### Circumstances and Legislation Under Which Complainants Acquired Vested Rights to do Local Business in Alabama.

Apart from the facts stated in the bills, the court judicially knows that at the close of the war in 1865 our railroad system, then in its infancy, lay in dilapidation and ruin. The building of more railroads was vital to the welfare of the state. Of home capital there was none, and foreign capital would not invest without better security than the new railroads could give. Hence the state lent railroads its credit, and further encouraged their building by allowing counties, cities, and towns to aid them. The disasters and difficulties which this legislation entailed upon the state and people are a part of the history of the times, as well as the conditions existing for many years thereafter, which prostrated all kinds of enterprise.

The operation of these laws left the state and municipalities in debt, with a few important lines of railway built, others partly completed, and all poorly built and equipped. Public opinion discountenanced further state and municipal aid, the laws were repealed, and prohibition put in the Constitution against such aid in the future. As late as 1894 it appears from Executive Documents, Senate Journal of 1894–95, p. 56, that "many of our railroads are in the hands of receivers, and it has been a struggle on the part of others to pre-

vent a like fate." Three years before the Legislature, in view of the need for more railroads, the completion of the unfinished roads, and the renovation and betterment of existing systems, sought to induce foreign railroad corporations to aid in the development of the state, by holding out to them the promise of the enjoyment of large powers and privileges, if they bought or leased or aided and operated railroads within this state.

In pursuance of this policy, the Legislature enacted, whenever all the capital stock of a domestic railroad corporation is owned by a foreign corporation, the domestic corporation might sell and convey to the foreign corporation "all of its property, roadbed, rights and franchises," and that the railroads so purchased "shall be subject, in all respects, to the laws of the state, as if owned by domestic corporations." It was also enacted that any foreign corporation might subscribe to the capital stock of any other company, or otherwise aid it in the construction of its road, for the purpose of forming a connection with it, and that a foreign railroad corporation might lease or purchase any part or all of any railroad constructed by any other corporation, if the lines of such roads were contiguous or connected. Foreign corporations were also authorized to aid railroads chartered under the laws of this state "in the construction, renovation or operation of their railroads," by the indorsement of their bonds, or by guaranteeing the rental in the lease of such railroads, on any terms agreed upon by the respective boards of directors. Foreign corporations owning and operating any railroads here were also authorized "to purchase at judicial sale or otherwise, or lease or hold and use, any domestic railroad, or to acquire the whole or use all or any part of the capital stock, or of the property, roadbed, rights and franchises of any railroad corporation in this state whose railroad, the road of the foreign corporation or its predecessor, in interest shall be connected, either directly or by means of an intervening line." Afterwards the Legislature imposed a license tax upon railroads, and enacted, upon the payment of such tax and producing satisfactory evidence to the auditor that such corporation is prepared to transport passengers and freight, he shall issue a license to the corporation to operate its railroad in this state, and complainants have paid such tax, and received such license.

## The Proposal Made by the State's Laws.

These laws were a standing invitation to a particular class of persons, foreign corporations, not to the general public, to become pecuniarily interested in domestic railroads, a peculiar species of property, whose value comes from the exercise of the right to use it in transporting persons and things from point to point within the state, as well as in interstate commerce. Such a use of such property effected objects so important to the welfare of the people that the state as an inducement to foreign corporations to come to Alabama and engage in that business here might well bargain if they did so that their property rights would be protected by all the sanctions, which the law throws around like property of domestic corporations. A person who is clearly within the class to whom a proposal is made, and who accepts it, and complies

with its conditions, acquires contract rights thereby, as much so as when the proposal is addressed to him by name. Piqua Bank v. Knoop, 16 How. (U. S.) 380, 14 L. Ed. 977; American Smelting Co. v. Colorado, 204 U. S. 103, 27 Sup. Ct. 198, 51 L. Ed. 393.

The right of the foreign corporation to use this property, for both domestic and interstate commerce, was the right to which these statutes related. The state acting through the Legislature, which represents the sovereign as to such matters, proclaimed, in effect, to these foreign railroad corporations:

"If you buy a domestic railroad, the property and franchises of such corporations shall remain subject to the laws of Alabama, in the same manner as if owned by a domestic corporation, and you shall hold and enjoy the franchise of your vendor for the length of time, and upon the conditions, the charter or laws of the state prescribe while he holds it. If you lease a domestic railroad, you shall have the right to operate it, and transport over it all kinds of commerce, local as well as interstate, for the term specified in the laws of Alabama for the duration of leases. If you aid a domestic corporation by indorsement of its bonds, or make other business arrangements with it, you shall acquire such contract rights concerning such property as you and it may agree upon. The state, if you invest under these laws, will make them a part of your chartered rights in Alabama." Bank v. Knoop, 16 How. 380, 14 L. Ed. 977.

## The Acceptance of the Proposal and Acts Done Thereunder.

On the faith of these proposals, solemnly made by the state in its own statutes, these foreign corporations came to Alabama, and spent many millions of dollars in the purchase and leases of railroads, and arranged their business accordingly, and now operate several thousand miles of railway here. Did they not acquire some rights thereby? Can the state now lawfully say to them: "You cannot now hold and use this property upon the terms and conditions held out by the statutes. You purchased the mere privilege of using what you bought, in domestic commerce, only so long as the state does not object."

## No Right of Arbitrary Expulsion Reserved.

There is no hint in these statutes that the rights to be acquired might in any contingency be less in extent or value than those these laws offered, or that, instead of buying the right to use the property in local commerce for the time, and upon the conditions, prescribed by the existing laws, the purchaser took out only a temporary license to do a local business, revocable at the mere will of the state, at any time, or that the state might forfeit the right to do such business for any cause, which would not forfeit the right of any other property holder, similarly situated, to put his property to any lawful use. The reservation of any such right on the part of the state cannot be raised by implication, except by repudiating alike the plain language of the statutes, the declared objects they had in view, and the obligation of contracts entered into in pursuance of them. "It is against the rules, both of law and of reason, to admit by implication in the construction of a contract a principle which goes in destruction of it." Murray v. Charleston, 96 U. S. 445, 24 L. Ed. 760.

The mere arbitrary right of the state to expel a foreign corporation not having been reserved, it was abandoned and waived. It was at

the option of the state in the first instance to permit complainants to come only as its tenants at will, as to domestic business, or to permit them to contract for the enjoyment of property rights inconsistent with the exercise of this arbitrary prerogative of expulsion at pleasure. When the state consented to complainants' making contracts inconsistent with this prerogative, which contracts, if made, necessarily involved the acquisition of a vested right in the foreign corporation to use railroad property here, upon the terms and for the time and for the uses provided in the statute, the state consented to waive and abandon this right, and it is now estopped to withdraw its consent, to the prejudice of any one who acted upon that consent. Walker v. United States (C. C.) 139 Fed. 413.

Besides, acts the state suggested and desired the foreign corporations to do, under its own proposal, contained in its own laws, have resulted in contracts vesting in the foreign corporation the title to property and the right to use it, for the very purpose which the state now seeks to prevent. The Constitution of Alabama, § 95, forbids the state from now interfering with that use. Rights like these the Constitution of the United States also protects, in their integrity, against all hostile action of the state, except for forfeiture for cause, for misuser, or nonuser, prescribed by the law of the land, and applicable alike to all other corporations and natural persons similarly situated, and by judgment of the courts, after hearing, and not by statutory edict. Sinking Fund Cases, 99 U. S. 719, 25 L. Ed. 496; New Jersey v. Yard, 95 U. S. 105, 24 L. Ed. 352; Home of the Friendless v. Rouse, 8 Wall. (U. S.) 430, 19 L. Ed. 495; Steamship Company v. Joliffe, 2 Wall. (U. S.) 450, 17 L. Ed. 805; Farrington v. Tennessee, 95 U. S. 680, 24 L. Ed. 558; Powers v. Detroit Railway Company, 201 U. S. 543, 26 Sup. Ct. 556, 50 L. Ed. 860; American Smelting Company v. Colorado, 204 U. S. 103, 27 Sup. Ct. 198, 51 L. Ed. 393; Edwards v. Williamson, 70 Ala. 145; Missouri v. Lewis, 101 U. S. 22, 25 L. Ed. 989; Wilburn v. McCalley, 63 Ala. 436.

Complainants took, and now hold, the leased and purchased railroads, and the right to enjoy their use in local commerce, subject to no other restriction or ground of forfeiture than the laws of the state prescribed at the time of the leases, purchases and contracts, or as might thereafter be lawfully enacted under the police power. The police power of the state extends to the protection of its peace, good order, morals, welfare, and the health, lives, and limbs of its people. If the doing of an act cannot militate against the enjoyment of these rights, the state is without authority to forbid such act. Const. Ala. § 35; Joseph v. Randolph, 71 Ala. 506, 46 Am. Rep. 347.

The bringing of a suit by a foreign corporation in a federal court, to prevent the infringement of any right, given by the supreme law of the land, cannot imperil any interest or right of which the police power is the guardian. To attempt to support such an exercise of power under the police power of the state is to assert that the operation of the Constitution and laws, and the exercise of rights thereunder in the courts of the United States, are an attack upon the welfare of the state, or in some way menaces their well being and happiness. The accept-

ance of such a doctrine would finally carry with it the overthrow of our institutions.

### Complainants Entitled to Injunction Against Attempts to Prevent Their Doing Intrastate Business.

The state no longer has any arbitrary, sovereign, prerogative to prevent complainants at pleasure from carrying on intrastate commerce. It has parted with the power to expel complainants for bringing their suits here, not only by incorporating section 240 in its Constitution, but because contracts its laws authorized have ripened into vested rights, and also because the proposal made in its laws to a particular class of persons as regards the corporate rights they might enjoy as to a peculiar species of property, and their acceptance and acts under that proposal, have ripened into a "legislative contract." American Smelting Co. v. Colorado, supra. Such a contract needs no consideration outside of the object sought to be effected by it. The object in this case was the development of the state. The coming of foreign corporations here to engage in railroad business was deemed by the Legislature to be beneficial to the state. "That benefit constitutes the consideration for the contract and no other is required to support it." Home of the Friendless v. Rouse, 8 Wall. (U. S.) 437, 19 L. Ed. 495.

No arbitrary power of expulsion remaining, and the reasons assigned in this statute not constituting any legal cause for the forfeiture and confiscation of complainants' property which would be effected by its expulsion from local business, the execution of the statute must necessarily be enjoined. Its enforcement would violate the Constitution of Alabama, as well as infringe those provisions of the Constitution of the United States, which forbid a state to deprive any one of property without due process, or to deny the equal protection of the laws, or to impair the obligations of contracts.

### In Fixing Rates, Justice to Both Railroad and Public Must Be Considered.

The remaining question is whether, in the posture of these cases at this time, the court should grant a preliminary injunction against the enforcement of the statutes which prescribe 2½ cents per mile as the maximum rate for the carriage of intrastate passengers, and fix the maximum intrastate freight rate upon 110 specific commodities which the statute classifies, no preliminary relief being now asked as to the act which makes the freight rate in force on the 1st of January, 1907, the maximum freight rate thereafter to be charged for all other intrastate freight.

The most important of the principles of law which must govern these questions have been settled by the Supreme Court, though the bills raise some grave questions which have not been determined by that court, and which, on the present hearing, it is needless to consider. The court is now concerned only with an order which, while settling no equities in advance of final decree, may best preserve the status quo pending final hearing.

A railroad carrier not only engages in a public calling, but discharges a state function in building and maintaining highways, upon

which, as the state does not, it transports persons and things for a reward. Its rates are therefore subject to legislative regulation. In fixing rates the rights both of the corporation and of the public are to be considered. A corporation may not be required to use property for the benefit of the public without just compensation for the services which it renders. As is said by the Supreme Court:

"Each case must depend upon its special facts, and when the court, without assuming to itself to prescribe rates, is required to determine whether the rates prescribed by the Legislature for a corporation controlling public highways are, as an entirety, so unjust as to destroy the value of its property, for all the purposes for which it was acquired, its duty is to take into consideration the interest, both of the public and of the owners of the property, together with all the other circumstances that are fairly to be considered, in determining whether the Legislature, under the guise of regulating rates, exceeded its constitutional authority and practically deprived the owner of the property or its use without due process of law." Covington Turnpike v. Sandford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560; Smyth v. Ames, 169 U. S. 465, 18 Sup. Ct. 418, 42 L. Ed. 819.

It is also the settled doctrine of the Supreme Court that "the basis of all calculations as to the reasonableness of the rates charged by the corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public," and that, where the rates are prescribed for the transportation of persons and property only within the limits of the state, "their reasonableness or unreasonableness must be determined without reference to the interstate business done by the carrier, or to the profits derived from that business. A state cannot justify unreasonably low rates for domestic transportation considered alone upon the ground that the carrier is earning large profits upon interstate business, over which, so far as the rates are concerned, the state has no control, nor can the carrier justify unreasonably high rates on domestic business on the ground that it will be able, in that way, to meet the losses on its intrastate business." Domestic and interstate commerce, and the value of the property so devoted, must be kept separate in determining reasonableness of rates for domestic commerce.

It has been further ruled by the Supreme Court that, "in order to ascertain the value of the property devoted to the convenience of the public, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present, as compared with the original, cost of construction, and the probable earning capacity of the property, under the particular rates prescribed by the statute, and the sum required to meet operating expenses, are all matters for consideration, and can be given such weight as may be just and right in each case." These matters, however, serve only as guides in ascertaining the real value of the property; and it is upon this value, in most cases at least, that calculations must be made as to the reasonableness of rates fixed by law. Prima facie the rates fixed by law are reasonable. It devolves upon those who contest such rates to show that they are unreasonable. Ordinarily the constitutionality of a statute presents a pure question of law on the face of the statutes. In this class of cases, however, the Constitution forbidding rates to be fixed unreasonably low, a court, when it is

averred that the Constitution has been violated in this respect, must ascertain the facts upon which the reasonableness of the rates depends before it can finally pronounce upon the validity of the statute.

The question before the court on this preliminary hearing, therefore, is not what the final proof will show, but whether complainants by the state of facts now presented, in view of any opposing evidence, show such a probability that the rates will be held to be unreasonable on the final hearing, as justifies the court, in view of all the circumstances, in suspending the operation of the statute until the final decree, and, that appearing, whether the relative harm which may befall the adverse interest by restraining the operation of the statute requires the granting or withholding of the injunction.

## Facts Shown by the Bills.

Each of the bills show the number of miles of railroad operated in this state, and the amount of business both domestic and interstate, the gross income derived from each kind of business, the expenses of carrying on the business, the net income derived from each, and the value of their property devoted to domestic commerce.

They insist that the rates charged prior to the passage of the acts complained were reasonably low, fair, and just, and increased the prosperity of the country through which the roads ran, and that their lines of road have been economically and skillfully administered, the expense being reduced to a minimum consistent with proper service, and the discharge of their duties to the public, and that they have charged and received for the transportation of intrastate traffic rates which, though just and reasonably low, were as high as allowed by law or by the competitive conditions and other circumstances affecting traffic on each of said lines.

It is alleged that equipment, material, and nearly every kind of supplies used in their business and wages are higher now than in 1905 and 1906, which were the most profitable years in complainants' history; that taxes have been increased; that complainants have been adding to and improving their depot and terminal facilities and track equipments, but they are not adequate to meet the rapidly increasing demands upon the service; that business is congested for lack of facilities; that they have not the necessary money to meet these wants, and cannot borrow it unless they are permitted to earn a fair and just return. Each of the bills contains a detailed array and statement of figures showing the effect upon their business, if the rates complained of had been in force during their best years. These statements show, assuming that their business will be as good hereafter as in the years mentioned, and conducted at about the same cost, and consisting of same volume, that under the operation of the rates fixed by the statutes some of the complainants would not earn operating expenses, some a little above operating expenses, while the net earnings which any of the bills show, under the reduced rates, judging by past experience, will be 1½ per cent. per annum upon the value of property devoted to domestic commerce. Each of these bills is sworn to by the chief officers of the complainants.

### Sufficient Showing Made.

Making due allowance for errors in bookkeeping, and that items may have been charged to operating expenses which should go to capital, and for motives to overestimate the value of the property used in complainants' business, the court finds no reason to doubt that the figures furnish prima facie a fairly safe measure for estimating at this time the value of the property devoted to domestic commerce, and the amount of such business which may be expected to be done in the future, and thereby of measuring the effect of the reduced rates, if put into operation.

The court can know, as every other well-informed person in the jurisdiction knows, that their taxes will be greater in consequence of increased assessments and the imposition of new taxes, and that the tendency of wages, supplies, and equipments is upward. The complainants could not well misstate the actual amount of their income and business. Their property has been given in for taxation under the prevailing custom in Alabama, and is probably worth more than double the amount at which it is taxed. The income under the operation of the former laws is shown to have been moderate. Under these circumstances sufficient is shown to overcome the burden on the part of complainants as to the unreasonableness of the rates. No answers have been filed, and no affidavits presented, impugning the accuracy of the figures and statements of the value, or in any way denying the statements of facts in the bills.

Under well-settled principles of law, under such circumstances, preliminary injunction follows as of course. The eminent counsel for defendants could not, and did not, resist the issue of the preliminary injunctions.

### Not a Case for Experimenting with the Property of Complainants.

The court has not overlooked the rule that there are situations where the result of the operations of reduced rates, whether beneficial or otherwise, cannot well be ascertained, except by their actual operation, in which event courts may order such test. But the scant earnings and the probable deficiencies shown in the present posture of the cases cannot bring any of them within the influence of the rule. For the court, on this showing, to order the reduced rates to be put in force to ascertain their effect upon the revenues of complainants, would be as reckless as for a physician to deny a sufficient amount of nourishment to a man in order to ascertain whether it would harm his health.

### Not a Suit Against the State.

It has been settled beyond controversy by the decisions of the Supreme Court that a suit against individuals, who are state officers, to prevent their enforcing an unconstitutional statute which deprives a person of property rights, is not a suit against the state, within the meaning of the eleventh amendment to the Constitution. These decisions also uphold the right of complainants to go into equity, which alone can give them any adequate relief in cases of this kind. Osborn v. Bank, 9 Wheat. (U. S.) 738, 6 L. Ed. 204; Smythe v. Ames, 169

U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Prout v. Starr, 188 U. S. 537, 23 Sup. Ct. 398, 47 L. Ed. 584; Mississippi Railroad Commission v. Illinois Central Railroad Co., 203 U. S. 341, 27 Sup. Ct. 90, 51 L. Ed. 209.

### Complainants Entitled to Preliminary Injunction.

A preliminary injunction must issue against the defendants in each of the cases enjoining the execution of the statute, forfeiting complainants' rights, in consequence of suing in this court, to do domestic business, and the statutes reducing the passenger rate, and classifying and fixing the maximum rates upon 110 articles, until the final decree, upon complainants giving bond, to be fixed by the court, conditioned to pay, or cause to be paid, all loss or damage caused by the issue of the preliminary injunction, including overcharges or excess rates or charges, to every person, firm, company, or corporation which shall sustain any such loss or damage, or pay any such overcharge, excess rate, or charge.