In the Matter of the Application of ROCKLAND LIGHT AND POWER COMPANY, Petitioner, for a Certiorari Order against MILO R. MALTBIE and Others, Constituting the Public Service Commission, Head of the State Division of the Department of Public Service of the State of New York, and the PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Defendants.*

Third Department, May 15, 1934.

* See 148 Misc. 22.

*Cullen & Dykman* [*Jackson A. Dykman, Elton H. Beals, Sigourney B. Olney* and *Neile F. Towner* of counsel], for the Rockland Light and Power Company.

*Charles G. Blakeslee* [*Russell B. Burnside* of counsel], for the Public Service Commission.

HILL, P. J.   Petitioner is a public utility corporation engaged *inter alia* in the sale of electric energy in Orange, Rockland and Sullivan counties, N. Y.   This is a review by certiorari of orders made by the Public Service Commission on January 18, 1933, and amended on March 7, 1933, temporarily decreasing the electric rates charged by the petitioner, and directing that same continue pending the final determination of four proceedings, each addressed to the reduction of rates in all or some part of the area served by the petitioner.   There is also before the court an appeal from an order made at the Albany Special Term staying the Public Service Commission from enforcing the orders pending the decision and final disposition of this review.

Evidence on behalf of the petitioner was given prior to the amendment of March that the January reduction would lessen petitioner's income by about $135,000.   A representative of the Commission has testified that under the March amendment, the reduction would not exceed $119,000 and might amount only to $107,000.   While the correctness of these figures is not admitted by the company, it is not disputed.   The State does not question petitioner's operating costs, beyond a suggestion that unwise or unnecessary payments for managerial advice were made to a corporation owned by the same group of financiers that owns a controlling interest of petitioner's stock.   The unconstitutionality of the order is asserted by the company as it is claimed the new rates will permit a return of only about three and eighth-tenths per cent upon the investment, and that such a rate is confiscatory, while the Commission says the return will be adequate.

The statute under which the Commission acted had been in force for some years.   It is a part of section 72 of the Public Service Law: " If it shall be made to appear to the satisfaction of the commission that the public interest requires a change in the price of * * * electricity charged by any such * * * corporation * * * the commission, upon such terms, conditions or safeguards as it deems proper, may authorize an immediate, reasonable, temporary increase or decrease in such price pending a final

determination of the price to be thereafter charged by such * * * corporation."

Temporary rates fixed by the Commission are final legislative acts as to the period during which they are to remain in effect. If they are shown to be confiscatory, the company is entitled to have the enforcement enjoined pending the continuance and completion of the rate-making process. (*Prendergast* v. *N. Y. Telephone Co.*, 262 U. S. 43; *Cumberland Telephone & Telegraph Co.* v. *Louisiana P. S. Comm.*, 283 Fed. 215.)

The first hearing in the rate case was held in January, 1932, and was temporarily suspended later in that year when the matter of temporary rates was taken up. Had the Commission fixed an early date for the final hearing, it would be proper that this be taken into consideration as an element affecting the annulling of the order. However, the rate case is still continuing with no date fixed for a final hearing and more than a year has passed since the temporary rates were fixed. Under such conditions, the same principles of law apply concerning confiscation as would to rates fixed after a full hearing and final determination. (*Prendergast* v. *N. Y. Telephone Co.*, supra; *Cumberland Telephone & Telegraph Co.* v. *Louisiana P. S. Comm.*, supra.)

The court on this review is limited to the enforcement of constitutional rights. We may not interfere with the determination made by the Commission unless confiscation is established and upon that question the petitioner has the burden of proof. Rate making is a legislative function. The result may be reached by the exercise of legislative discretion and the use of legislative rather than judicial methods. These methods and the process may be examined by the court for their bearing upon the validity of the determination made. However, judicial jurisdiction does not go beyond the constitutional question. (*Los Angeles Gas Corp.* v. *Railroad Commission*, 289 U. S. 287, 304, 305.) The " legislative methods " here applied are disclosed by the three memoranda of the Commissioner who conducted the hearings, supplemented by a few intervening transactions. The first memorandum dated in September, 1931, recites the complaints; the offer of the company to fix a new maximum rate of ten cents per killowatt hour in place of rates varying from seven to eleven cents, which it was estimated would effect a saving of $26,400 to consumers; the public discussion in the locality concerning the proposal, including an open letter published by the mayor of Middletown, and the opinion expressed by an alderman; the expression of opinion by a Commission expert " that from his studies he believes it is possible for the company to make a reduction

of possibly $40,000 rather than the $26,400 which they now offer, but he is doubtful whether a rate case would produce any greater reduction than that; " an expression of opinion by the Commissioner that he believes it would be best for the people that the matter be amicably adjusted and settled along the lines mentioned, but that the attitude of the complainants indicates the desire for a rate case " and they will not be satisfied unless the Commission immediately proceeds with it."

Such disposition was made, the rate case begun, seventeen hearings held, the first in January, 1932; more than 1,750 pages of evidence taken, and a hundred exhibits received. This was followed by a new offer of compromise made by the company it is claimed " without prejudice." A condition attached to the offer was that all complaints be withdrawn. When the matter of temporary rates was taken up, exhibits were introduced concerning petitioner's fixed capital, operating expenses and receipts, outstanding stocks and bonds, together with rates of dividends. These had been prepared by experts of the Commission from reports on file in its office.

On December 23, 1932, a second memorandum was prepared by the hearing Commissioner and approved by the Commission. It contains a brief historical *résumé* of proceedings, and the attempted compromises, and states that in May, 1932, the company had proposed reductions aggregating $76,000, $35,000 in the western part of the territory, $41,000 in the eastern (petitioner asserts that these offers also were made " without prejudice "); that the offer of the company was met by a counter proposition from the representative of the complainants for a reduction of $150,000, $90,000 in the west and $60,000 in the east; that a Commission expert gave testimony which " consisted chiefly of figures taken from the annual reports made by the company to the Commission, or simple computations made therefrom, setting forth, for the period from January 1, 1926, to September 30, 1932, balance sheets, detailed figures for fixed capital, income statements, detailed figures for revenues and operating expenses, operating expenses per kilowatt hour sold and per customer, and amounts paid to C. H. Tenney & Co.; " that the same expert presented " a table showing income and surplus items applicable to electric operations, which involves an allocation of interest and dividends and certain miscellaneous debit items between the electric and gas departments and other activities of the company," and allocated the revenues, expenses, fixed capital, reserves and net working assets between the eastern and western territories; an exhibit was mentioned showing a payment of $82,207 to Charles H. Tenney & Co. " for

managerial and other services rendered;" and it concluded with directions that reductions "of at least $70,000 in the eastern division and $35,000 in the western division in retail rates for residential and commercial customers" be made.

The Commission's expert, who had testified to the facts which he said the reports on file with the Commission disclosed, on January 12, 1933, wrote a letter to the attorney for the company, stating in connection with the preparation of the rates which would reflect the aggregate decrease ordered by the Commissioner, " It is obvious not only that the company has in its possession the basic data consisting of bills rendered to customers under the present rates, but also has made extensive studies, compilations and tabulations of this data; and that it is impossible for me to ascertain the effect upon the company's revenues and upon customers' bills of a proposed change in the rate without access to such compilations and tabulations," and asked that the same be made available. But without waiting for compliance, and on January 18, 1933, the order fixing the reduction was made. This was followed by petitioner's application for a rehearing, which was granted. Thereat petitioner offered all the testimony taken in the rate case prior to January 18, 1933. This was received, but exhibits prepared by the company's experts containing an inventory in valuation of its property used in the public service were excluded. Following the rehearing, the Commissioner prepared his third memorandum under date of March 7, 1933. It stated that the rate named in the January order would probably produce a diminution of income amounting to $135,000, which was greater than intended. A modification was directed, designed to effect a diminution not greater than $119,000 nor less than $107,000.

Petitioner complains that its offers of compromise made " without prejudice " and in an effort to buy its peace, were considered by the Commission in making its determination as to temporary rates. Their consideration is obvious from the Commissioner's memoranda. Had the proceeding been judicial, doubtless this would require a reversal, and while it is somewhat startling that offers made by way of attempted compromise should be treated as evidence, in violation of the claimed understanding, it is doubtful if it presents reversible error in a hearing conducted under " legislative method." In determining the amount that it was fair and right to charge for electricity, and incidentally whether petitioner's property was to be confiscated, it was non-judicial to give consideration to the political utterances of a mayor and an alderman, and " the attitude of the people in the locality," but the methods used were legislative and not judicial. The exclusion of the

inventories and the valuation placed by the company's experts upon the property used in the public service was a substantial error and affected petitioner's legal rights, as the question of value is all important in determining whether the rate is confiscatory, and the burden of proof on this issue is upon the petitioner. It is highly debatable whether the effect of this error was overcome by the admission of the evidence of the company's experts as to some of the data in the excluded exhibits.

The written and oral arguments of the Commission indicate that the value of petitioner's property was determined from the amount of "fixed capital" carried on the books, checked and verified by reference to the par value of the stocks and certificates of indebtedness issued by the company. The tabulation as to the capital account begins with the year 1912 when it amounted to $1,962,625.38. In every year following, except one, this was increased until in 1931 the amount was $19,208,789.99. This was reduced by the comparatively small amount representing gas properties, and electric plant located outside the State of New York. By this method the Commission arrived at what it obviously regarded as a sort of historical cost of petitioner's property. The Commission has power to and does prescribe the manner in which the accounts of utility corporations are kept, and exercises supervision and control as to the items which may be entered. A capital account properly kept and which truly reflected the actual cost of the property purchased would be enlightening. Directions given by the Commission as to entries in fixed capital of other utilities have been disapproved by the courts. In *People ex rel. Iroquois Gas Corp.* v. *Public Service Commission* (238 App. Div. 184; revd., 264 N. Y. 17) the Commission by order approved the purchase by relator of property for $130,000, but required that $40,000 should be shown as a loss and charged to surplus, and only $90,000 carried as an item in fixed capital. The fixed capital account of petitioner furnishes little information concerning the cost of its property if like rulings have been made. In the brief filed by the attorney for the Commission, a balance of about a million dollars in an account entitled "Retirement Reserve," kept under order of the Commission, was deducted from the fixed capital account. Petitioner disputes the propriety of this deduction, and argues that the items are not for accrued depreciation. We are not enlightened concerning the nature of the entries in this account. If it is a surplus accumulated to compensate for the diminished value of petitioner's property caused by use or obsolescence, it would be deductible, for the depreciation each year is charged as a part of the operating expenses and collected from the consumers, to the end that when any item of property becomes useless through

old age or obsolescence, a fund for replacement will be in hand. Items of personal property that have been used are of less value than when new, and the company should receive return on a proportionately less amount, being that it already has been paid by the consumer for the portion of the machine worn out in his service.

The reported income from the operation of petitioner's electric business for the year 1931, after deducting the $119,000 increase, would show a little over a million dollars applicable to a return upon the value of the property. In determining a proper rate of return, consideration should be given to that received upon other investments generally, and these, at the time of the hearing, were affected adversely by the world-wide depression. The value of the property upon which petitioner was entitled to receive a return was not fixed by the Commission. Its attorney in his brief suggests that it was $18,778,953, arriving at that figure by adding working capital of $575,000 to the fixed capital account kept as ordered by the Commission, and taking out the retirement reserve of about $1,000,000. He urges as corroboration that the company has outstanding capital stock of $13,530,330, bonds $5,364,200, and notes payable $2,050,000, amounting in all to $20,944,530, which he reduces by about $1,600,000, at which sum he estimates the value of the company's property used in the gas business, and then points to the similarity of the totals between fixed capital and securities issued. The only statement made by the Commission throwing any light upon the subject appears in the Commissioner's memorandum of December 23, 1932: " It appears that temporary rates can reasonably be established making reductions of at least $70,000 in the Eastern Division and $35,000 in the Western Division in retail rates for residential and commercial customers. These amounts are only slightly greater than the company has offered to make. Even after such reductions, the evidence indicates that the company will be able to earn over $7\frac{1}{2}\%$ upon its common stock, in addition to paying Federal income taxes out of operating expenses." When it is recalled that interest upon over $7,000,000 of bonds and notes is first to be taken from the Commission's estimate of $1,065,000 to be received after the reduction of rates, his statement indicates a valuation several million dollars less than that made by the attorney. The petitioner claims a return upon more than $29,000,000.

It has been said frequently by the Supreme Court of the United States, and recently repeated by Chief Justice HUGHES, in the prevailing opinion in *Los Angeles Gas Corp.* v. *Railroad Commission (supra)*, that a public utility is entitled to " ' a fair return upon the reasonable value of the property at the time it is being

used for the public,'" and in substance that it is to be determined not by formulas but by a reasonable judgment, "'having its basis in a proper consideration of all relevant facts,'" and that among those facts is the actual cost of the property, the amount which the owners paid for it, "but while cost must be considered, the court has held that it is not an exclusive or final test. The public have not underwritten the investment. The property, on any admissible standard of present value, may be worth more or less than it actually cost," and further, "in order to determine present value, the cost of reproducing the property is a relevant fact which should have appropriate consideration. * * * The weight to be given to actual cost, to historical cost, and to cost of reproduction new is to be determined in the light of the facts of the particular case." The Commission determined the value without having before it an inventory of the property to be evaluated, placing reliance almost entirely upon the controlled fixed capital account, without proof either as to "actual cost," "historical cost" or "cost of reproduction new," and omitting any item for going value, concerning which the opinion in the *Los Angeles Case* (*supra*) says: "The concept of going value is not to be used to escape the just exercise of the regulatory power in fixing rates, and, on the other hand, that authority is not entitled to treat a living organism as nothing more than bare bones." One of the elements to be considered is "going value." (*People ex rel. Kings County Lighting Co.* v. *Willcox*, 210 N. Y. 479.)

The orders should be annulled. The order of the Albany Special Term granting a stay should be affirmed.

RHODES, McNAMEE, BLISS and HEFFERNAN, JJ., concur.

Determination of the Public Service Commission fixing temporary rates annulled, with fifty dollars costs and disbursements.