In the Matter of the Application of the VILLAGE OF TUPPER LAKE, NEW YORK, Petitioner, for an Order to Review a Determination of the PUBLIC SERVICE COMMISSION against MILO R. MALTBIE and Others, Constituting the Public Service Commission of the State of New York, and the PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondents.*

Third Department, November 1, 1939.

* See 170 Misc. 265.

*Andrews, McBride & Fennell* [*Harold H. McBride* of counsel], for the petitioner.

*Gay H. Brown, Counsel to Public Service Commission* [*John T. Ryan* and *Porter L. Merriman* with him on the brief], for the respondents.

FOSTER, J.   This is a review of an order of the Public Service Commission dated March 30, 1938, as amended by an order dated April 26, 1938, which directed petitioner's municipal electric utility to establish, on or before June 1, 1938, certain reduced rates set forth in the order, the effect of which was intended to reduce petitioner's annual net income by the sum of $12,000.   Petitioner

contends that the reduction order is confiscatory of its property, in that it will deprive petitioner of a fair and reasonable return thereon; and that the Commission has committed error in certain other respects in arriving at its conclusions. There is no substantial disagreement between the parties as to the figures covering the many different items involved, but there is serious disagreement as to the application of these figures.

Petitioner began the operation of its plant in 1903, and for sixteen years operated it at a loss. This loss was paid either by direct assessments upon the taxpayers or from the general village fund. About 1920 it contracted with the United States Government Hospital, a Federal reservation of some 140 acres located just outside the village, to supply it with electricity. From this time on petitioner began to show a profit and paid back to the village various sums for the relief of taxation.

The utility serves the village of Tupper Lake for municipal purposes, and also the inhabitants of the village. In addition it serves a rural district adjoining the village in the town of Altamont, and also the Federal hospital already mentioned.

For convenience in arriving at the precise matters in dispute the operating properties of petitioner may be restated and divided into the following four classes:

(A) Property within the village used only for service to consumers therein;

(B) Property within the village and used to furnish service in lighting the streets and village buildings;

(C) Property used for service to consumers outside the village and in the town of Altamont;

(D) Property used in furnishing service to the United States Government Hospital.

Petitioner contends that if the reduction of $12,000 is applied to income derived from A, B and C, the base rate will produce a return as low as 4.29 per cent. The fair value of these properties as found by the Commission is $145,461. Net annual income therefrom is $18,241.81. After deducting $12,000, the amount of its earnings will be $6,241.81. The percentage of return, therefore, will be 4.29 per cent, which petitioner claims is confiscatory. It should be emphasized here for the sake of clarity that petitioner contends that these are the properties, the fair value of which should constitute the rate base; and it should also be noted that the property used to furnish service to the Federal hospital is excluded.

The Commission's view is that the property devoted to lighting streets and village buildings, which serves the village at cost, should be excluded from the base rate. It does not contend that

the property devoted to the service of the Federal government should be included. Upon that theory the fair value of the property applicable to general consumers inside and outside the village, that is, property heretofore classed under A and C, is $106,176. The net income is $18,156.60. Subtracting the reduction order of $12,000 leaves the earnings at $6,157, or a return of 5.8 per cent on the valuation of $106,176.

Certainly this last mentioned percentage cannot be considered confiscatory. If a return of 4.29 is considered so, and the weight of authority is apparently to that effect (*West* v. *Chesapeake & Potomac Tel. Co.*, 295 U. S. 662; *West Ohio Gas Co.* v. *Public Utilities Commission of Ohio*, 294 id. 63), then the nub of the controversy as to this phase of the proceeding is whether the street lighting properties should be eliminated as a part of the rate base. Their inclusion or exclusion marks the difference in the rate of return.

Petitioner urges that it is entitled to a fair and reasonable return upon all of its property used and useful in the public service (*Matter of Village of Boonville* v. *Maltbie*, 272 N. Y. 40; Public Service Law, § 72), and that the street lighting properties come within this definition. It also claims, however, the right to exclude property used to furnish service to the Federal government.

The Commission's position is in brief that " a utility cannot segregate the unregulated service which is profitable and not segregate that which is unprofitable." By that which is unprofitable it means the street lighting properties, the service of which is furnished at cost. By that which is profitable is meant the properties used to serve the Federal hospital. A distinction is sought to be made between taxpayers and general consumers. Thus, it is claimed by the Commission that the village, and, therefore, the taxpayers, are furnishing service to themselves, in lighting streets and public buildings, for which they pay only the cost, and in order to earn a return upon the properties devoted to these purposes the set-up contended for by the village would require general consumers to pay the return over and above cost.

It is indisputable that as a matter of law a municipal utility is entitled, the same as a private utility, to a reasonable return upon all of its property used and useful in the public service. The question presented then is whether the property devoted to lighting streets and public buildings is used in public service, or whether only property used in furnishing service to general consumers is to be held useful in the public service. There is no precise authority on this point and a review of authorities alleged to bear upon it would be fruitless. It seems clear, however, reasoning from general principles, and a common sense view of the purpose for which

municipal utilities were created, that the Commission's contention in this respect represents an ultra-refined distinction. The service furnished by the street lighting properties, for instance, is not merely to taxpayers but also to general consumers as well. The convenience, indeed, the necessity serves all. The light shines on the general consumer in the same manner and for the same purpose that it shines upon the taxpayer.

While it may be true that the village owes a duty to light the streets, if that be so considered, then it must also be considered that such duty devolves upon the village in its governmental capacity, while as the owner of the plant it acts in a proprietary capacity. Such distinctions, however, are unnecessary. The term " public service " should be as broadly construed as the plain import of the language carries, and under such construction public lighting is necessarily included thereunder. This determination renders it unnecessary to discuss the effect of the uniform accounting system upon the right of the village to charge more than cost for such service. Whether the Commission would have power to prescribe rates for village lighting we are not called upon to decide in order to determine the issues here. It seems doubtful that an exemption excepting " State, municipal or Federal contracts," would apply to a contract made between the village and itself, but it may be so in view of the distinction that can be technically drawn as to the capacity of ownership.

Over the Federal hospital contract, and operating properties in connection therewith, the Commission has no jurisdiction. (Public Service Law, § 66, subd. 12.) It may be conceded that the elimination of such property creates an inequitable situation from a regulatory standpoint, but I fail to see what can be done about it so long as the exemption stands. If the Commission has no authority to fix rates in connection therewith, it follows as a logical corollary that it cannot include the value of the property used for such purpose as a base rate. It possesses only the power conferred upon it by statute. It does not, therefore, possess the power, in order to equalize the situation, to disregard the rule that all property useful in the public service must be included in the rate base by discarding the street lighting properties. Lack of jurisdiction on the one hand cannot furnish a basis for the exercise of improper power as to the other. (*Smyth* v. *Ames,* 169 U. S. 466; *Seaboard Air Line R. Co.* v. *Railroad Commission,* 155 Fed. 792.) We reach the conclusion, therefore, that the Commission followed an erroneous theory in making the order complained of by refusing to include property devoted to lighting the public streets and buildings.

The other issues involved are these: whether error was committed in fixing the working capital at $16,170 or $17,500; whether it was error to disallow the spread of expense in the lawsuit known as the Paul Smith case over a ten-year period; whether the Commission committed error in basing its order for lowered rates upon evidence *dehors* the record; and whether due consideration was given to petitioner's evidence of the effect of future business conditions upon its earning capacity.

These issues must be approached in the light of the rule that this court, on a review of this character, is limited to enforcement of constitutional rights. (*Matter of Rockland Light & Power Co. v. Maltbie*, 241 App. Div. 122.) We do not substitute our judgment upon the facts for that of the Commission, and only examine the facts to determine whether there is substantial evidence to sustain the determination. (*Matter of New Rochelle Water Co. v. Maltbie*, 248 App. Div. 66.)

Petitioner claims that the Commission should have allowed for working capital the sum of $17,500, that being the maximum amount testified to by a member of the Commission's staff. As a matter of fact, however, the village's expert testified that the sum of $16,170 was sufficient for working capital. It appears that the Commission did not approve in all respects the methods used by this witness in arriving at his estimate; nevertheless it allowed for working capital the very amount he testified to. I fail to see, therefore, how this may reasonably be said to be a proper foundation upon which to base a claim for confiscation. It must also be considered in connection with its contention that the amount of $17,500 was named as a maximum amount, and was said by the Commission's expert to be $2,500 higher than a private utility would be entitled to receive. In any event it clearly appears that the Commission's decision in this regard was based upon conflicting evidence as to an issue of fact.

Petitioner also contends that the Commission erred in determining future operating expenses in that it did not spread the cost of the lawsuit over a power contract which the village had with Paul Smith's Company over a period of ten years. It appears that the Commission did make such a spread in connection with expenses incurred in 1937 with the defense by the village of a negligence case known as the Morrison case. The action of the Commission in this regard was a proper exercise of discretion and judgment dealing with future possibilities that were wholly problematical. It is quite evident that the spread of the Morrison case was made because of a real possibility of a recurrence of such a form of action. The same cannot be said, however, with relation to the lawsuit

involving a contract with another power company. There is no evidence in the record, and there could not be from the very nature of the case, to indicate that expenses similar to those experienced in connection with the contract lawsuit would be incurred in the immediate future. We cannot say that the Commission acted arbitrarily or capriciously in this regard.

As to the Commission basing its order for lowered rates upon evidence outside the record, it appears by stipulation that the data referred to was before the Commission at the time this determination was made. Petitioner's attorneys merely reserved the right to argue that such information was insufficient to enable the Commission to determine that the rates prescribed would effect the amount of reduction intended. The Commission has followed such a procedure for many years, and for the reason that until the Commission determines the amount of increase or reduction which is warranted by the evidence in a proceeding, it is unable to take any steps to determine what particular rates should be prescribed to effect such reduction. The amount of reduction is not determined until the formal hearings in the proceeding are closed, and the parties have been afforded an opportunity to file their briefs setting forth their contentions as to the facts and the law. Petitioner makes no direct statement to the effect that the rates prescribed will effect a greater reduction than was intended by the Commission. The presumption is that the determination of the Commission was proper in this regard. (*Darnell* v. *Edwards*, 244 U. S. 564.) In so far as this point may be germane there is no valid reason to criticise the action of the Commission.

Petitioner claims that the Commission erred in not giving due consideration to its contention that future revenues would decline ten per cent from those shown for 1937 because of future business conditions. The evidence given on this matter was pure opinion testimony by an expert called in behalf of petitioner. The weight to be accredited thereto, especially since it concerned future conditions and was, therefore, more or less speculative, was entirely for the Commission. This court has no power to reweigh that evidence and redetermine the credibility to be given thereto.

The determination should be annulled on account of the erroneous exclusion of property devoted to the public use, as indicated in this opinion, and the matter remitted to the Commission.

Hill, P. J., Bliss and Schenck, JJ., concur; Crapser, J., dissents and votes to confirm the determination.

Determination annulled, with fifty dollars costs and disbursements, and matter remitted to take such action as indicated in opinion.